In re The **APPLIANCE STORE, INC.;** and **Northeast Consumer Technology Stores, Inc., Debtors.**

**MONTROSE CENTRE, Movant,**

v.

**NORTHEAST CONSUMER TECHNOLOGY STORES, INC., Respondent.**

Bankruptcy Nos. 92–1573–BM, 92–1574–BM. Motion No. 92–2933M.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 2, 1992.

Lisa A. Bookman, Bernstein and Bernstein, P.C., Pittsburgh, PA, for Movant/Montrose Centre.

Norman E. Gilkey, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, PA, for Debtor/Northeast Consumer Technology Stores, Inc.

David K. Rudov, Rudov & Stein, Pittsburgh, PA, for the Official Committee Of Unsecured Creditors.

Stephen I. Goldring, Office of U.S. Trustee, Pittsburgh, PA.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Montrose Centre ("Montrose") has submitted a motion to compel payment of administrative rent in the amount of $28,375.67.

Montrose asserts that it is entitled, pursuant to written leases, to immediate payment in the amount of $14,867.18 for postpetition rent for July and August of 1992, to immediate payment in the amount of $1,646.90 for common area maintenance charges for June through August of 1992, and to immediate payment in the amount of $11,861.59 for real estate taxes owed postpetition by debtor to Montrose.

Northeast Consumer Technology Stores, Inc. ("debtor") and the Committee of Unsecured Creditors (the "Committee") admit that Montrose is entitled to payment of $8,579.83 as an administrative expense. Specifically, they agree that Montrose is entitled to an administrative expense for unpaid rent in the amount of $7,433.59 for July of 1992 and for unpaid common area maintenance charges in the amount of $1,146.25 for June and July of 1992.

Debtor and the Committee object to payment of the remaining $19,795.84 as an administrative expense.

A portion of that amount, they contend, should be treated as *pre*petition rather than postpetition debt. They argue that the amount owed for real estate taxes ($11,861.59) does not qualify as an administrative expense because said taxes were incurred under Ohio law prior to the filing of the bankruptcy petition.

They also contend that the remaining $7,934.25 of Montrose's request should be denied altogether. According to debtor and the Committee, Montrose is not entitled to rent in the amount of $7,433.59 and to common area maintenance charges in the amount of $500.66 for August of 1992 because said expenses were incurred *after* debtor had effectively rejected the leases.

Two arguments have been advanced in support of this latter position. According to debtor and the Committee, rejection of the leases effectively occurred on July 31, 1992, when debtor notified Montrose that it was rejecting the leases and filed a motion in this court for authorization to do so. Court approval, they insist, is not a condition precedent to effective rejection of the leases. Also, debtor and the Committee argue that Montrose is not entitled to administrative rent subsequent to July 31, 1992 because Montrose conferred no benefit on the bankruptcy estate after that date.

Montrose will be awarded $20,763.62 in administrative expenses. Unpaid rent in the amount of $14,867.18 for July and August of 1992, debtor's unpaid share of common area maintenance charges in the amount of $812.60 for June of 1992, and debtor's unpaid share of real estate taxes in the amount of $5,083.54 qualify as administrative expenses. Debtor's unpaid share of common area maintenance charges in the amount of $834.30 for July and August of 1992 and debtor's remaining share of real estate taxes in the amount of $6,778.05 do not qualify as administrative expenses and will be disallowed in their entirety as administrative expenses. Montrose's request that it be paid immediately will be denied. Payment will be deferred until distribution is made to all other creditors.

## I

## FACTS

Debtor sells household appliances and electronic goods to consumers through retail outlets it operates in Ohio.

Montrose is a partnership which operates a shopping complex ("complex") located at 3900 Medina Road, Copley Township, Ohio.

On October 3, 1985, Montrose and Katy's of Elyria, Inc. ("Katy's") executed a written lease agreement whereby Katy's leased space in the complex for a term of ten (10) years commencing on November 7, 1985. The lease provided for a monthly rental payable on the first day of every calendar month of $4,971.33 for the first sixty (60) months of the lease term and of $5,717.03 for the remaining sixty (60) months. In addition, the lease provided that the lessee was to pay twelve percent (12%) of specified common area maintenance charges and real estate taxes.

The lease contained the following provision concerning real estate taxes:

A. Lessee shall pay to the Lessor its proportionate share, as herein defined (12%), of real estate taxes and assessment, assessed against the entire Building Complex of which the Demised Premises are a part.... ·

B. Within 15 days after the billing is received by the Lessor, he shall furnish Lessee with a copy of said billing together with a statement of Lessee's proportionate share. Within 15 days after re-

ceiving said statement, Lessee agrees to pay its proportionate share to the Lessor.

The lease further provided that the Lessee was to pay its proportionate share of common area maintenance charges within 15 days of receipt of a bill from the Lessor indicating the actual cost thereof.

Montrose, Katy's, and debtor executed a document on August 15, 1986, whereby Katy's assigned and debtor assumed the above lease executed on October 3, 1985. Debtor agreed to perform all of Katy's obligations arising under the lease.

Debtor was desirous of increasing its space in the complex. Accordingly, debtor and Montrose executed another lease agreement on December 31, 1986 for additional space. The second lease was for a term of 109 months commencing on November 1, 1986 and provided for a monthly rental payable on the first day of every calendar month of $1,492.00 for the first forty-nine (49) months and of $1,716.56 for the remaining sixty (60) months. In addition, the lease provided that debtor was to pay 3.6 percent of specified common area maintenance charges and real estate taxes and contained a provision concerning real estate taxes which was identical in all relevant respects to the above-quoted provision in the lease of October 3, 1985.

On April 7, 1992, debtor filed a voluntary chapter 11 petition at Bankruptcy No. 92–1574–BM. The Appliance Store, debtor's sister company, also filed a voluntary chapter 11 petition that same day at Bankruptcy No. 92–1573–BM.

On May 1, 1992, debtor filed a motion to extend the time in which to reject certain leases, including those with Montrose. An order of court was issued on June 4, 1992 granting debtor an extension until September 8, 1992. The order provided in part as follows:

Debtors are required, as a condition of said extension, to remain current on all postpetition payments and other obligations under the leases which debtors have not rejected.

Debtor concluded after it had filed for bankruptcy that some of its stores would have to be closed. A decision was made on or about June 20, 1992 to close the store located in the complex. Debtor had not yet decided, however, whether to reject the leases in question or to sublet the premises to another party if one could be found.

Frank Quigley, debtor's Chief Financial Officer, sent the following letter to Montrose on June 23, 1992:

As you are aware, a decision has been made to close The Appliance Store/Northeast Store location in property leased from you. A decision to reject this lease has not yet been made and will be based on appraisal of the leasehold.

In the meantime, we will keep you informed as to when we will have removed our property from this location.

At this time we will give you a set of keys to the space for security reasons. However, we will maintain a set of keys to be used by appraiser/agent in this matter.

Please call if you have any questions in this matter.

Debtor vacated the premises that same day and provided Montrose with a set of keys while retaining a set of keys for itself.

On July 13, 1992, Montrose sent debtor an invoice which indicated that debtor owed Montrose $812.60 for common area maintenance charges for June of 1992 and $5,083.54 for debtor's share of real estate taxes owed by Montrose for the second half of 1991.

After consulting with its expert to ascertain the feasibility of subletting the premises to another party, debtor decided to reject the Montrose leases.

On July 31, 1992, debtor filed a motion to reject several leases, including the leases with Montrose. The Committee consented to the relief requested by debtor.

Also on July 31, 1992, Quigley sent the following letter to Montrose:

Effective Friday July 31, *we are initiating the process* of rejecting the lease between either The Appliance Store/Northeast and your firm for property previously leased from you.

It is my understanding that we have previously relinquished possession of this space to your representatives. (Emphasis added.)

Debtor never returned the remaining keys to the premises which it had retained subsequent to June 23, 1992. Montrose has been unable to find a new tenant for the space vacated by debtor.

Montrose sent debtor an invoice on August 18, 1992 which indicated that debtor owed Montrose $333.64 for common area maintenance charges for July of 1992.

Montrose sent debtor another invoice on August 30, 1992 which indicated that debtor owed Montrose $6,778.05 for real estate taxes owed by Montrose for January of 1992 through August 31, 1992.

An order of court was entered on September 1, 1992 approving debtor's rejection of the Montrose leases. Montrose was granted thirty (30) days' time in which to file a claim for rejection damages.[1]

On September 17, 1992, Montrose sent debtor an invoice which indicated that debtor owed Montrose $500.66 for common area maintenance charges for August of 1992.

Debtor has not paid the monthly rentals of $7,433.59 due for July and August of 1992, respectively. In addition, it has not paid any of the common area maintenance charges or real estate taxes which are reflected in the invoices issued on July 13, 1992, August 18, 1992, August 30, 1992, and September 17, 1992, respectively.

On September 18, 1992, Montrose filed the motion to compel payment of administrative rent which is now before the court. Debtor and the Committee objected in part to the motion.

An evidentiary hearing was held on Montrose's request on October 27, 1992, at which time debtor and Montrose were given an opportunity to present any evidence they considered appropriate. Thereafter

the parties were given a time frame to brief their respective positions.

## II

## ANALYSIS

Several issues have been raised by the parties.

A) *Effective Date Of Rejection Of Leases.*

The first issue that must be resolved is whether the effective date of rejection of the leases occurred on July 31, 1992, when debtor notified Montrose by letter that it was "initiating the process of rejecting the lease", or occurred on September 1, 1992, when an order of court approving rejection of the leases was issued.

Debtor and the Committee argue that Montrose is not entitled to administrative expenses after July 31, 1992. They contend that rejection of the leases effectively occurred when debtor notified Montrose of its intention to reject the leases. Court approval, they insist, is not a condition precedent to effective rejection.

Montrose argues that it is entitled to an administrative expense for all accrued postpetition expenses until the order approving rejection of the leases was issued on September 1, 1992. According to Montrose, rejection did not effectively occur on July 31, 1992, when debtor notified Montrose of its intention to reject the leases. Court approval, Montrose insists, is a condition precedent to effective rejection.

11 U.S.C. § 365(a), which governs rejection of unexpired leases of the debtor, provides in pertinent part as follows:

... [T]he trustee [2], *subject to the court's approval*, may assume or reject any executory contract or unexpired lease of the debtor. (Emphasis added.)

The plain, unequivocal language of the provision indicates that court approval is a precondition to a debtor's rejection of a lease. *See Sealy Uptown v. Kelly*

1. In fact, on September 30, 1992, Montrose filed a proof of claim detailing $145,341.22 in damages sustained as a result of this lease rejection. This Memorandum Opinion and Order do *not* attempt to deal with the issues raised therein.

2. The term "trustee" in this instance also refers to a debtor-in-possession. *See* 11 U.S.C. § 1107(a).

*Lynn Franchise Co. (In re Kelly Lynn Franchise Co.),* 26 B.R. 441, 444 (Bankr. N.D.Tex.1983); *In re National Oil Co.,* 80 B.R. 525, 526 (Bankr.D.Colo.1987); *In re Revco D.S., Inc.,* 109 B.R. 264, 267 (Bankr. N.D.Ohio 1989).

A comparison of the provisions of the present Bankruptcy Code ("Code") to those of the former Bankruptcy Act ("Act") reinforces this conclusion.

The Act did not prescribe any formal procedure for rejecting unexpired leases. Courts were split as to whether rejection could be inferred from a debtor's conduct or whether court approval was required in order for rejection to occur.

Some courts have held that assumption or rejection could be inferred from acts or oral statements as well as by written declarations. Acceptance or rejection could be accomplished without prior court approval. *See In re Forgee Metal Products, Inc.,* 229 F.2d 799, 801 (3d Cir.1956); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1007 (3d Cir.1973); *Nostromo, Inc. v. Fahrenkrog,* 388 F.2d 82, 85 (8th Cir.1968).

Other courts have held that court approval was required before acceptance or rejection could occur. *See Texas Importing Co. v. Banco Popular de Puerto Rico,* 360 F.2d 582, 584 (5th Cir.1966); *Bradshaw v. Loveless (In re American National Trust),* 426 F.2d 1059, 1064 (7th Cir.1970).

The present Code differs significantly from the former Act in that the procedure whereby assumption or rejection can occur is specified. As has been noted, the clear language of § 365(a) expressly provides that assumption or rejection of an unexpired lease is "subject to court approval".

Section 365(a) of the Code is augmented by certain bankruptcy rules which specify the nature of the procedure to be followed in assuming or rejecting an unexpired lease. Bankruptcy Rule 6006(a) specifies that proceedings to reject an unexpired lease shall be governed by Bankruptcy Rule 9014, which provides in pertinent part that:

> ... [R]elief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.

It should come as no surprise that the former Act and the various interpretations thereof resulted in confusion and uncertainty where assumption or rejection of unexpired leases of realty were involved. Section 365(a) overruled by legislation those cases which required a court to examine the words and actions of a debtor to ascertain whether it had effectively rejected a lease. *See Treat Fitness Center, Inc. v. Rainbow Investment (In re Treat Fitness Center, Inc.),* 60 B.R. 878, 879 (9th Cir. BAP 1986). It accomplished this by eliminating the need for the court to undertake the often difficult task of interpreting a party's conduct and instead required that the debtor seek the court's approval. *See In re A.H. Robins Co., Inc.,* 68 B.R. 705, 708 (Bankr.E.D.Va.1986).

Debtor's rejection of the lease was not effective until September 1, 1992, when the court approved debtor's motion to reject it.

B) *Real Estate Taxes.*

The second issue is whether that portion of Montrose's claim which is for real estate taxes is a postpetition or a prepetition claim.

Montrose submitted an invoice to debtor dated July 13, 1992 which indicated that debtor's proportionate share of real estate taxes owed by Montrose for the second half of 1991 amounted to $5,083.84. On August 30, 1992, Montrose submitted another invoice to debtor which indicated that debtor's proportionate share of real estate taxes for the first eight (8) months of 1992 amounted to $6,778.05.

Montrose maintains that the entire amount—i.e., $11,861.59—qualifies as an administrative expense because said taxes, like the rentals for July and August of 1992 and the common area maintenance charges for June, July, and August of 1992, became due subsequent to the filing of the bankruptcy petition on April 7, 1992 but prior to rejection of the leases on September 1, 1992.

Debtor and the Committee assert that the above real estate taxes should be treat-

ed as a *pre*petition rather than postpetition debt and accordingly do not qualify as an administrative expense.

They argue that the dispositive factor in determining whether the tax debt owed by debtor to Montrose is prepetition or postpetition is when the lien for the taxes attached to the property and not when the taxes owed by Montrose were due. Ohio law, they note, provides that the lien of the taxing authority for a given year attaches to the property subject to the tax on January 1st of that year. The lien cannot be avoided because the amount of the lien has not been ascertained as of that date and cannot be paid at that time. Tax assessments relate back to the date on which the lien attached, even though all steps necessary for the assessment occur after that date.

Accordingly, they argue, the liens for taxes owed by Montrose for 1991 and 1992 attached *prior* to the filing of the bankruptcy petition on April 7, 1992. Real estate taxes owed by Montrose for 1991, including those for the second half of 1991, attached on January 1, 1991. Real estate taxes owed for 1992, including those for the first eight (8) months of the year, attached on January 1, 1992. The fact that these taxes may have been assessed and were due after the filing of the bankruptcy petition does not transform them into postpetition taxes. They relate back to January 1, 1991 and January 1, 1992, respectively.

Montrose's claim for payment as an administrative expense of debtor's share of real estate taxes owed by Montrose will be granted in part and denied in part. That portion of its claim for taxes which is reflected in the invoice dated July 13, 1992—i.e., for $5,083.54—will be allowed as an administrative expense. However, that portion which is reflected in the invoice dated August 30, 1992—i.e., for $6,778.05—will not be allowed as an administrative

expense. Rather, it will be *disallowed as an administrative claim in its entirety* because debtor's obligation to pay the tax arose *after* the lease had been rejected on September 1, 1992.

■ The reliance of debtor and the Committee upon the law of Ohio concerning when a tax lien attaches is misplaced. Were Montrose rather than Northeast the debtor in this case, the law cited by them might be apposite for determining whether or not the debt *owed by Montrose to the taxing authority* was prepetition. The issue raised here, however, is whether the debt *owed by debtor to Montrose* for debtor's proportionate share of real estate taxes owed by Montrose is a prepetition or a postpetition debt.[3] The statutes and other authorities cited by debtor and the Committee shed no light on when this debt arose.

The relationship between debtor and Montrose in this regard is created in and determined by the leases described previously. Accordingly, when debtor's obligation to Montrose arose with respect to payment of debtor's proportionate share of real estate taxes is governed by the leases. As has been noted, the salient provision in the leases pertaining to real estate taxes reads as follows:

A. Lessee shall pay to the Lessor its proportionate share ... of real estate taxes and assessment, assessed against the entire Building Complex of which the Demised Premises are a part ...

B. Within 15 days after the billing is received by the Lessor, he shall furnish Lessee with a copy of said billing together with a statement of Lessee's proportionate share. *Within 15 days after receiving said statement, Lessee agrees to pay its proportionate share to the Lessor.* (Emphasis added.)

■ The most plausible reading of this provision is that debtor's obligation to pay to Montrose its proportionate share of as-

---

3. Debtor and the Committee apparently recognized this but nonetheless invited the court to apply analogically the authorities to which they cite. The invitation must be declined. The obligation of a property owner to a taxing authority for property taxes is determined by statute. The obligation of a lessee to a lessor for payment of the lessee's proportionate share of such taxes is *not* so determined. Laws prescribing when a debt for taxes arises in the former type of situation shed little or no light on when a debt for taxes arises in the latter type of situation.

sessed real estate taxes arose fifteen (15) days *after* receipt of a statement from Montrose setting forth the amount owed by debtor. The time when the debt of *Montrose* for these taxes arose is not relevant to determining when *debtor's* obligation to Montrose arose.

■ Montrose sent debtor an invoice dated July 13, 1992 indicating that debtor owed Montrose the sum of $5,083.54 for real estate taxes. Debtor evidently received the invoice shortly thereafter. According to the above lease provision, debtor's obligation to Montrose with respect to these taxes arose some fifteen (15) days later—i.e., on or shortly after July 28, 1992—and approximately a month prior to effective rejection of the leases on September 1, 1992.[4]

Application of the same reasoning compels a different conclusion concerning real estate taxes for the first eight months of 1992.

■ Montrose sent debtor an invoice dated August 30, 1992 indicating that debtor owed Montrose the sum of $6,778.05 for real estate taxes for January through August of 1992. Debtor evidently received the invoice shortly thereafter. According to the above lease provision, debtor's obligation with respect to these taxes arose some fifteen (15) days later—i.e., on or about September 14, 1992. Debtor effectively rejected the leases on September 1, 1992, two days after issuance of this invoice. Accordingly, debtor's obligation to Montrose with respect to these taxes arose approximately two weeks *after* the leases had been effectively rejected. Montrose's administrative claim with respect to these taxes must be denied because said debt accrued after the conclusion of the administrative period.

**4.** This same result would follow even if debtor had effectively rejected the leases on July 31, 1992. Debtor's obligation to repay Montrose for these taxes arose prior to July 31, 1992.

**5.** The determination that the real estate taxes reflected in the invoice dated July 30, 1992 and the common area maintenance charges reflected in invoices dated August 30, 1992 and

■ As has been noted, Montrose sent debtor an invoice dated August 18, 1992 indicating that debtor owed $333.64 in common area maintenance charges for July and 1992 and another invoice dated September 17, 1992 indicating that debtor owed $500.66 in common area maintenance charges for August of 1992. Also, the leases contained a provision which provided that debtor was obligated to pay its proportionate share of common area maintenance charges within fifteen (15) days of receipt of a bill from Montrose indicating the actual cost thereof.

The charges reflected in these invoices must be disallowed in their entirety for the same reason that debtor's share of real estate taxes as reflected in the invoice dated August 30, 1992 was altogether disallowed. Debtor's obligation to pay these charges arose *after* effective rejection of the leases on September 1, 1992.[5]

C) *Entitlement To Administrative Priority.*

The third issue is whether the rental payment of $7,433.59 for August of 1992 and debtor's share of real estate taxes as reflected in the invoice dated July 13, 1992 are entitled to administrative priority.

Debtor and the Committee concede that the unpaid rental of $7,433.59 for July of 1992 and the unpaid common area maintenance charge of $812.60 are entitled to administrative priority. They deny, however, that the unpaid rental of $7,433.59 for August of 1992 and debtor's share of real estate taxes in the amount of $5,083.84, as reflected in the invoice dated July 13, 1992, qualify as administrative expenses because said expenses do not represent "actual, necessary costs and expenses of preserving the estate", as is required by 11 U.S.C. § 503(b)(1)(A).

September 17, 1992 must be denied altogether should not be misconstrued. Montrose is *not* precluded by this determination from seeking to recover damages resulting from termination of the leases. *See* 11 U.S.C. § 502(b)(6). This latter issue is not presently before the court and has not been decided.

Montrose asserts that the full amount of the rental for August of 1992 and debtor's proportionate share of real estate taxes in the amount of $5,083.84 qualify as administrative expenses, without regard to section 503(b)(1)(A).

The contention of debtor and the Committee is without merit. Montrose is entitled to payment as an administrative expense of the full amount of rent due for July and August of 1992 ($14,867.18), the common area maintenance charges of $812.60 for June of 1992, and real estate taxes in the amount of $5,083.84 as reflected in the invoice of July 13, 1992.

■■■■■ 11 U.S.C. § 503(b)(1)(A) provides that administrative expenses shall be allowed, after notice and hearing, for "the actual, necessary costs and expenses of preserving the estate". In order for an expenditure to qualify as "actual" and "necessary", it must benefit the estate as a whole. See In re Jartran, Inc., 886 F.2d 859, 871 (7th Cir.1989). The benefit must be actual, as opposed to potential. See In re Subscription Television of Greater Atlanta, 789 F.2d 1530, 1532 (11th Cir.1986).

■■■■■ Debtor's reliance upon section 503(b)(1)(A) is misplaced. A landlord is entitled to postpetition administrative rent at the rate provided for in the lease, including all charges provided for, through the date on which the court approved rejection of the lease. See In re CSVA, Inc., 140 B.R. 116, 119 (Bankr.W.D.N.C.1992).

The controlling provision, with respect to this issue is 11 U.S.C. § 365(d)(3), which provides in pertinent part as follows:

> The trustee shall timely perform all the obligations of the debtor, ... arising from and after the order for relief under any unexpired lease of nonresidential real property, *until such lease is assumed or rejected, notwithstanding section 503(b)(1)(A) of this title.* (Emphasis added.)

■■■■■ The clear language of this provision requires the trustee (or debtor-in-possession in a chapter 11 case) to perform in a timely manner all postpetition obligations which arise under an unexpired lease until the lease is assumed or rejected. It has been determined that the leases in question were not effectively rejected until September 1, 1992, when an order was issued approving rejection of the lease. Included among the obligations arising under the leases was the obligation to pay as they became due all rentals and other charges specified therein. Accordingly, debtor is obligated by the express language of section 365(d)(3) to pay to Montrose all rentals and other charges due under the leases through September 1, 1992.

■■■■■ The obligation of the trustee to perform in a timely manner is mandatory, not permissive. These obligations are not excused if the trustee fails to perform. Instead, the lessor is entitled to a postpetition claim for administrative rent. See In re CSVA, Inc., 140 B.R. at 119.

■■■■■ It does not matter that debtor formally notified Montrose on July 31, 1992, approximately a month before the order issued on September 1, 1992, that it was rejecting the lease. Montrose *need not* establish that the requirements of section 503(b)(1)(A) have been met in order for the above allowed expenses to qualify for administrative priority. Section 365(d)(3) expressly provides that the trustee shall perform all obligations arising under the lease "notwithstanding section 503(b)(1) of this title"—i.e., in spite of or without regard for it. See In re CSVA, Inc., 140 B.R. at 119–20.

## D) *Entitlement To Immediate Payment.*

The final issue is whether Montrose is entitled to immediate payment of its administrative claim.

Montrose insists that it is entitled to immediate payment. Debtor has neglected to address this issue, as perhaps it was confident of prevailing on previous issues.

■■■■■ A claim for administrative rents pursuant to section 365(d)(3) generally is entitled to *immediate* payment, absent a showing of substantial doubt that sufficient funds will be available to pay all administrative claimants in full. See In re

**244**

*Four Star Pizza, Inc.*, 135 B.R. 498, 500 (Bankr.W.D.Pa.1992).

██ The court has reviewed the entire record in this case and is concerned that there may not be sufficient funds with which to pay all administrative claimants in full.

Interim applications for payment of professional fees and expenses for services rendered during the first six (6) months of these bankruptcy cases have been submitted from counsel to debtor-in-possession, counsel to the Committee, accountant for the Committee, and counsel to a secured creditor. The total requested by these professionals comes to $617,163.66. It should be noted that all of these applications are interim. Some applicants can be expected to submit additional applications for services rendered later in this case.

In addition to the above interim applications, several applications for payment of administrative rent totalling $96,610.23 also have been submitted.

In all, applications for payment of administrative expenses totalling $713,773.89 have been filed to date. As has been noted, it is reasonable to anticipate that additional fee applications will be submitted in the future.

No determination has been made with regard to most of the above applications. They may or may not be granted in full.

The court has grave reservations concerning debtor's ability to pay all of these administrative claims in full. Debtors' financial situation was precarious at best when they filed for bankruptcy. Subsequent events have done little to instill in the court confidence that their situation has substantially improved since they filed or will improve in the foreseeable future.

Montrose's request that its administrative claim be paid immediately must be denied. It will be paid when distribution is made to all administrative claimants. Should there be insufficient funds to pay all allowed administrative claims in full, Montrose shall be paid at the time of distribution on a *pro rata* basis.

An appropriate order shall be issued.

ORDER OF COURT

AND NOW at Pittsburgh this 2nd day of December, in accordance with the accompanying Memorandum Opinion it is ORDERED, ADJUDGED and DECREED that the Amended Motion To Compel Payment Of Administrative Rent by Montrose Centre is ALLOWED in the amount of $20,-763.62. Montrose's request that its claim be paid immediately is DENIED. Payment shall be made when distribution is made to all other administrative claimants.