**In re AMBER'S STORES, INC., Debtor.**

**Bankruptcy No. 395–35650–HCA–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

March 13, 1996.

R. Michael Farquhar, Winstead Sechrest & Minick P.C., Dallas, Texas, for Debtor.

Stephen A. McCartin, Gardere & Wynne, L.L.P., Dallas, Texas, for Petula.

Patrick Neligan, Neligan & Averch, L.L.P., Dallas, Texas, for Unsecured Creditors Committee.

### MEMORANDUM OPINION ON MOTION TO COMPEL PAYMENT OF POST–PETITION LEASE OBLIGATIONS

HAROLD C. ABRAMSON, Bankruptcy Judge.

Came before the Court for consideration on the 29th day of January, 1996, the Motion to Compel Payment of Post–Petition Lease Obligations under 11 U.S.C. 365(d)(3) ("Motion") filed by Trammell Crow Company and Petula Associates, Ltd. (Collectively, "Petula") and the Response to the Motion ("Response") filed by Amber's Stores, Inc. ("Amber's"). This memorandum opinion constitutes the ruling of the Court thereon, and shall constitute findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014. This is a contested matter over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 151, and the standing order of reference in this district. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## I. STATEMENT OF FACTS

Amber's is a specialty retailer of arts and crafts products and related merchandise used chiefly for craft and hobby projects, home decorating and personalized gifts, and operates retail in Texas, Louisiana, Missouri and Mississippi. Amber's filed a Chapter 11 bankruptcy petition on September 8, 1995. Prior to the Chapter 11 filing, Amber's entered into a lease agreement (the "Petula Lease") with Petula, on April 4, 1994, to rent approximately 282,487 square feet of nonresidential real property located at 3950 Bastille Road, Dallas, Texas. The Petula Lease contained a 60–month lease term, with an option to extend the lease for an additional 60–month term. Pursuant to the terms of the Petula Lease, commencing June, 1, 1995, Amber's was required to pay monthly base rent of $56,497.40, in addition to a monthly assessment of real estate taxes, insurance, utilities, and operating expenses.

Prior to Amber's bankruptcy filing, Amber's gave notice to Petula of its intent to cease business operations and its intent to vacate the Petula Lease premises. The parties at the hearing agreed that Amber's had vacated the premises and turned over the

keys to Petula over one month before filing for bankruptcy. On the date of the Chapter 11 filing, Amber's served its Emergency Motion to Reject Certain Unexpired Non–Residential Real Property Leases ("Emergency Motion") on Petula, the Petula Lease was included as one of the leases to be rejected in the Emergency Motion. The Emergency Motion was filed by the Debtor on the morning of September 11, 1995, and was approved by the Court, as to the Petula Lease, that afternoon, because the attorneys for both Petula and Amber's were before the Court on a related matter and there was no opposition by Petula. The other leases contained in the Emergency Motion were rejected by an order entered on September 18, 1995, after notice to the parties and an opportunity for objections. The Emergency Motion expressly requested that the Court approve the rejection of the Petula Lease effective as of the petition date. Amber's requested retroactive rejection because it had already vacated the leased premises, had turned over the keys to Petula, and had informed Petula of its decision to reject the lease. The Court granted Amber's request for rejection as of the petition date on September 11, 1995, and the order was entered on September 13, 1995.

The Motion filed by Petula requests the Court to enter an order compelling the immediate payment of all un-paid post-petition lease obligations due prior to rejection of the Petula Lease by Amber's under 11 U.S.C. § 365(d)(3). Amber's responded by saying that the Court granted the rejection of the Petula lease retroactively to the petition date, therefore, there is no post-petition lease obligation due under § 365(d)(3), or alternatively, that if there is a valid claim by Petula for the post-petition lease obligation, it should be subjected to an analysis by the Court under § 503(b) to determine the amount actually and necessary incurred in preserving the estate.

## II. ISSUES

The two issues before the Court are: (1) whether a nonresidential real property lessor is entitled to an administrative expense priority for post-petition, pre-rejection lease payments under 11 U.S.C. § 365(d)(3), or whether the lessor must first meet the requirements of 11 U.S.C. § 503(b)(1)(A) in order to establish an administrative expense priority payable under 11 U.S.C. § 507; and (2) the effective date of rejection of the lease under 11 U.S.C. § 365(a).

## III. ANALYSIS

### A. Administrative Expense Priority

Section 365(d)(3) was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984). The statute provides in relevant part that:

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising from or after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period.[1]

Prior to the 1984 amendments to the Bankruptcy Code, a landlord's claim for post-petition rent was limited to the estate's liability for the reasonable value for the debtor's actual use and occupancy of the premises.[2] That claim for use and rent, to the extent it was allowed under 11 U.S.C. § 503(b)(1),[3] was given administrative status and was therefore sometimes known as administrative rent.[4] Congress added § 365(d)(3) in order

---

1. 11 U.S.C. § 365(d)(3).

2. See, In re Braniff Airways, Inc., 783 F.2d 1283 (5th Cir.1986).

3. Section 503(b)(1)(A) provides:

   (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
   (1)(A) the actual necessary costs and expenses of preserving the estate including wages, salaries, or commissions for services rendered after the commencement of the case.

4. In re Braniff Airways, Inc., 783 F.2d 1283, 1286 (5th Cir.1986).

to ease the burden on nonresidential lessors caused by the loss of rental income during the post-filing but pre-rejection period by creating an administrative expense claim governed exclusively by the terms of the lease. In describing the effects of the Amendment, the legislative history provides:

> [When the trustee has stopped making payments due under the lease] the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position.... The bill will lessen these problems by requiring the trustee to perform all of the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that the debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease. For cause, the court can extend the time for performance of obligations due during the first 60 days after the order for relief, but not beyond the end of such 60–day period. At the end of this period, the amount due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time. This permissible 60–day grace period is intended to give the trustee time to determine what lease obligations the debtor has and to locate the cash to make the required payments in exceptionally large or complicated cases.[5]

Whether a nonresidential real property lessor is entitled to an administrative expense priority for post-petition, pre-rejection lease payments under § 365(d)(3), is an issue that has been addressed frequently by the courts.[6] The courts are in agreement that § 365(d)(3) requires the trustee to make rental payments under nonresidential real property leases until the lease is either assumed or rejected. There is a disagreement, however, over how to treat rental payments that have not actually been made by the trustee after the petition is filed, but prior to rejection of the lease. If the lease were assumed, the trustee would have to bring the rental obligations current or make other arrangements with the landlord to cure the prior lease obligations, but in a case where the trustee has not made the post-petition, pre-rejection lease payments required under § 365(d)(3), and then subsequently rejects the lease, there is a question as to how the unpaid rental payments should be treated by the court.

Two lines of cases have developed in this area. The majority of courts appear to hold that § 365(d)(3) gives a lessor an administrative expense for post-petition lease obligations that occur while the trustee decides to assume or reject the lease.[7] While a minority of courts hold that, irregardless of the express language in § 365(d)(3), a landlord must establish its claim for administrative status under Section 503(b)(1)(A) before claiming an administrative expense for post-petition, pre-rejection rent payments.[8]

**(i) Minority View**

The leading case for minority view is *In re Orvco*,[9] in which the court held, "when a lease is deemed rejected, a lessor must es-

**5.** 130 Cong.Rec. S8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch).

**6.** The Court would urge the reader to review the Memorandum Opinion of the Honorable Larry E. Kelly, the Chief Bankruptcy Judge for the United States Bankruptcy Court for the Western District of Texas, in *In re Mr. Gatti's, Inc.*, 164 B.R. 929 (Bankr.W.D.Tex.1994), for an in-depth and scholarly analysis of the history behind § 365(d)(3) and virtually all the case law in this area prior to 1994.

**7.** *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401 (9th Cir.1994); *In re Compuadd Corp.*, 166 B.R. 862 (Bankr. W.D.Tex.1994); *Maroon v. Four Star Pizza, Inc. (In re Four Star Pizza, Inc.)*, 135 B.R. 498 (Bankr.

W.D.Pa.1992); *In re Worths Stores Corp.*, 135 B.R. 112 (Bankr.E.D.Mo.1991); *In re Tobago Bay Trading Co.*, 142 B.R. 528 (Bankr.N.D.Ga.1991); *In re Revco D.S., Inc.*, 109 B.R. 264 (Bankr. N.D.Ohio 1989).

**8.** *See, e.g., Great Western Savings Bank v. Orvco (In re Orvco)*, 95 B.R. 724 (9th Cir. BAP1989); *In re Mr. Gatti's, Inc.*, 164 B.R. 929 (Bankr. W.D.Tex.1994); *In re Laurence R. Smith, Inc.*, 127 B.R. 715 (Bankr.D.Conn.1991); *In re Tammey Jewels, Inc.*, 116 B.R. 292 (Bankr.M.D.Fla. 1990).

**9.** 95 B.R. 724 (9th Cir. BAP1989).

tablish its claim for administrative status under Section 503(b)(1)(A), the specific section governing such status."[10] In *Orvco* a lease had been automatically rejected pursuant to § 365(d)(4),[11] when no action was taken to assume it after 60 days. The lessor sought a ruling that all of the payments required to be made under the lease must be paid, without consideration of the actual use, occupancy, or benefit to the bankruptcy estate and further sought a ruling that the payment was administrative in nature and the estate should be compelled to make the payment immediately, without the need for a determination by the court under § 503(b)(1)(A). The Ninth Circuit Bankruptcy Appellate Panel found that once a lease is deemed rejected, nothing in the applicable Code section attempts to determine the administrative status of the unpaid rent obligation and concluded:

> In our view, the language of 365(d)(3) "notwithstanding section 503(b)(1)," means that notwithstanding the administrative or non-administrative status of a claim by a lessor, a bankruptcy court must order its payment pending assumption or rejection. It does not mean that the necessity for showing the reasonableness of the rent or of any of the other factors considered under Section 503(b)(1)(A) has been completely abrogated.[12]

This view was later rejected by the Ninth Circuit in *Pacific–Atlantic Trading Co.*[13] The court found that § 365(d)(3) authorizes administrative status for unpaid rent during the post-petition, pre-rejection period, without consideration by the Court under § 503(b)(1), and concluded that:

> By providing for timely performance of all lease obligations, "notwithstanding section 503(b)(1)," the statute has already granted priority payments status to the full amount

of rent due under nonresidential leases. The fact that a trustee does not comply with this directive before the lease is rejected cannot justify denying a lessor the priority treatment for the full amount which Congress has already bestowed upon it.[14]

Prior to *Pacific–Atlantic Trading Co.*, the Bankruptcy Court for the Western District of Texas in *Mr. Gatti's*,[15] adopted a view similar to the reasoning in *Orvco*. The court said:

> After reviewing the history of the treatment of lessors and the rationale stated by the divergent line of cases attempting to construe Section 365(d)(3), this court concludes that the *Orvco* analysis is the more appropriate one ... Congress chose not to spell out the consequences of default under Section 365(d)(3), not because it believed that courts would somehow discern its intent to automatically allow an administrative or super-priority claim, but because it felt the landlord's interest was not adequately protected by other provisions in the Code.[16]

The court came to this conclusion because it reasoned that, by establishing the right of the landlord to receive post-petition rent prior to the rejection of a lease, the landlord's interests were protected by other provisions of the Code that allow for remedies of a default, such as conversion or dismissal of the case for "cause."[17] The Ninth Circuit rejected this line of reasoning in *Pacific–Atlantic Trading Co.*, when it said:

> The *Orvco* decision relies, in part, upon the premise that a lessor is not without remedy because the lessor may move for a bankruptcy court order for the trustee to

---

10. *Id.*

11. Section 365(d)(4) of Title 11 provides:
    Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

12. 95 B.R. at 728.

13. *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401 (9th Cir.1994).

14. *Id.* at 404.

15. *In re Mr. Gatti's, Inc.*, 164 B.R. 929 (Bankr. W.D.Tex.1994).

16. *Id.* at 946.

17. *Id.*

pay rent, and order the immediate surrender of the leased premises if the trustee fails to comply. *Orvco*, 95 B.R. at 727. One court has even suggested that the existence of these remedies makes it unfair to grant administrative priority to a lessor's claim for the contractual rent during this period: "It would be truly an unfair proposition to permit the landlord to sit idly by and not seek either payment or recovery of the premises by relying on the fact that his contractual rent will be accorded administrative priority occupied and presented no benefit to the estate." *In re Tammey Jewels, Inc.*, 116 B.R. 292, 294 (Bankr.M.D.Fla.1990). We observe, however, that section 365(d)(3) expresses the intent of Congress to secure for lessors the full amount of rent due during the 60–day period while the trustee determines to accept or reject the lease, regardless of any benefit to the estate. The statute does not require the lessor to take any action.[18]

The minority view seems to circumvent the express language in the statute to avoid the inequities in the rule established by Congress. The minority courts find that compelling payment of rent until the debtor either assumes or rejects a lease, and a 60–day period for the debtor to make the decision, along with the remedies afforded to landlords upon the debtor's refusal to pay is enough. Thus, awarding an administrative expense "notwithstanding section 503(b)(1)" is not necessary, even though this is what the statute provides. As in *Orvco*, when the court said, in essence, that even though payment must be ordered pending rejection, failure to make the required payment when due does not necessarily mean that the debtor will be forced to make the required payment, because the statute does not expressly provide for this.[19]

### (ii) Majority View

■ In contrast, the Majority finds support for its position that § 365(d)(3) gives a lessor an administrative expense for postpetition lease obligations that occur while the trustee decides to assume or reject the lease in both the legislative history and the unambiguous language of § 365(d)(3).[20] As stated by the Supreme Court in *United States v. Ron Pair*, where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"[21] The court in *Ron Pair* went on to say:

> The plain meaning of the legislation should be conclusive, except in the "rare cases [in which] the literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters" ... [in such a case] the intention of the drafters, rather than the strict language, controls.[22]

■ This Court must rely on the plain meaning of the statute because it does not believe that the language in § 365(d)(3), "notwithstanding section 503(b)(1) of this title," is ambiguous. Rather, this Court believes that the statute means what it says, that "the trustee shall timely perform all of the obligations of the debtor ... arising from or after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, *notwithstanding section 503(b)(1)* of this title."[23] In other words, a lessor has an administrative expense claim for unpaid post-

---

**18.** *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401, 404–405 (9th Cir.1994) (The court in *Mr. Gatti's* used a similar reasoning to the *Tammey Jewels* court when it said that a lessor had other remedies that it should use if the debtor is not making postpetition rent payments).

**19.** 95 B.R. at 728.

**20.** *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.)*, 27 F.3d 401 (9th Cir.1994); *In re Compuadd Corp.*, 166 B.R. 862 (Bankr. W.D.Tex.1994); *In re Worths Stores Corp.*, 135 B.R. 112 (Bankr.E.D.Mo.1991); *In re Coastal*

*Dry Dock & Repair Corp.*, 62 B.R. 879 (Bankr. E.D.N.Y.1986).

**21.** *United States v. Ron Pair Enterprises, Inc. (In re Ron Pair Enterprises, Inc.)*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

**22.** *United States v. Ron Pair Enterprises, Inc. (In re Ron Pair Enterprises, Inc.)*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (citation omitted).

**23.** 11 U.S.C. § 365(d)(3) (emphasis added).

petition lease obligations that occur before the lease is rejected, either by the trustee, or due to the time limitations of § 365(d)(4), and a landlord need not establish its claim for administrative status under Section 503(b)(1)(A). As stated by Senator Hatch when the legislature enacted § 365(d)(3), "This timely performance requirement will insure that the debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease." [24]

On one hand, this Court would tend to agree with the court in *Mr. Gatti's,* that in enacting § 365(b)(3) in an effort to provide a safeguard for landlords by shortening the period provided to the debtor for a decision on whether to assume or reject a lease Congress may have gone too far,[25] but on the other hand, this Court must also agree with the above-cited reasoning by the Ninth Circuit in *Pacific–Atlantic Trading Co.,* and the decisions by the majority courts that have found that the plain meaning of the statute should control.[26]

From the "plain meaning" of the statute, this Court must follow the majority view. The meaning is clear, and it complies with the wishes of the drafters of the statute to insure timely performance of rental obligations by the debtor and to provide an incentive for a quick decision by the debtor to assume or reject the lease. Therefore, the landlord must be paid its administrative claim for the amount of rent due under the lease agreement for the post-petition, pre-rejection period and a landlord need not establish its claim for administrative status under Section 503(b)(1)(A).

■ The Court, however, does not follow the line of cases that would give this adminis-

trative expense claim for post-petition rental payments a "super-priority" status;[27] it is simply an administrative expense of equal priority with other administrative claims under § 507(a)(1). There are probably enough assets in this case to pay all administrative claims, and therefore, the Court could order that any administrative claim for post-petition rent by Petula be paid immediately. However, in a case where the estate is insolvent and is unable to pay all administrative expenses, the landlord is entitled to payment on a pro-rata basis with all other allowed administrative claims.[28]

### B. When Does Rejection Occur?

■ The next issue the Court must consider is the effective date of rejection of the Petula Lease. This is necessary to determine the amount of any administrative claim to which Petula is entitled under § 365(d)(3) for the un-paid rental payments. Section 365(a) provides that:

(a) Except as provided in section 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.[29]

The question put to the Court by both Amber's and Petula is, "When does rejection of the lease occur?" Amber's claims a lease should be considered rejected on the day the trustee serves its motion to reject. Petula contends that the date on which the court enters an order approving the motion to reject is the date the Court should rely on.

On this issue, the courts are again divided. The majority of courts faced with this question have found that the effective date of

---

**24.** 130 Cong.Rec. S8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch).

**25.** This was addressed in a subsequent Memorandum Opinion from the Western District of Texas by the Honorable Frank R. Monroe, Bankruptcy Judge, when he found that although the conclusion in *Mr. Gatti's* was the right result in the context of what the law should be, the opposite result was compelled under the rule embodied in § 365(b)(3). *In re Compuadd Corp.,* 166 B.R. 862 (Bankr.W.D.Tex.1994).

**26.** *See supra* note 20.

**27.** *See, e.g., Inland's Monthly Income Fund v. Duckwall–ALCO Stores, Inc. (In re Duckwall–ALCO Stores, Inc.),* 150 B.R. 965 (D.Kan.1993); *In re Telesphere Communications, Inc.,* 148 B.R. 525 (Bankr.N.D.Ill.1992); *In re Rare Coin Galleries of America,* 72 B.R. 415 (D.Md.1987).

**28.** *See Maroon v. Four Star Pizza, Inc. (In re Four Star Pizza, Inc.),* 135 B.R. 498, 500 (Bankr. W.D.Pa.1992); *In re Granada, Inc.,* 88 B.R. 369, 375 (Bankr.D.Utah 1988).

**29.** 11 U.S.C. § 365(a).

rejection is the date of the entry of bankruptcy court's order approving rejection, and that court approval is a condition precedent to an effective rejection.[30] The minority view is that rejection is effective when the landlord receives unequivocal notice of the debtor's intent to reject the lease, and rejection may occur prior to issuance of the court's order approving rejection, as a condition subsequent to the trustee's independently effective rejection.[31]

At first blush, the equities of a case such as this, where the debtor has vacated the premises and handed over the keys to the lessor pre-petition with an unequivocal intent to reject the lease by the service of a motion to reject on the lessor on the date the petition is filed, would lead a court to consider the minority position so as not to reward a lessor for the time it takes the debtor to get a court order.[32]

In this case, Amber's served a motion to reject the Petula Lease on Petula on the date the petition was filed, but the order approving rejection was not entered until five days later. Why should the debtor be penalized by having to wait for an order to be entered rejecting a lease before the lease is considered rejected, when there is an unequivocal action on the debtor's part to reject the lease, the debtor is receiving no benefit from the leased premises, and the debtor has filed a motion with the court to reject? The short answer to this question is because the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require it.

■ Section 365(a) of Title 11 read together with Federal Rules of Bankruptcy Procedure 6006 and 9014 require that when rejecting a lease, the debtor or the trustee must file a formal motion to assume or reject a lease and there must be notice to parties in interest with an opportunity to object in a contested proceeding before the court.[33] Rejection only occurs after approval by the court.

The Court can understand the allure of the argument to which other courts have succumbed, allowing the effective rejection under § 365(a) to be the date the lessor receives unequivocal notice of intent to reject,[34] but if the Court were to follow this view, appealing as it would be in this situation, then there would be no certainty on the part of either the lessor or the debtor as to when the lease will be rejected and the premises can be re-leased.

This Court also finds the best policy lies in the majority view that relies on an order by the court for determination of the date of rejection. How could the parties be sure of the date if the rule were anything else? For example, on the present set of facts, the debtor vacated the premises and turned over the keys prior to the date that the petition was filed,[35] the motion to reject was served on Petula on the petition date, but was not filed with the Court until three days later. When can the lessor rely on the rejection by the debtor and be in a position to re-lease the premises? The only logical answer is when

**30.** *See, e.g., In re 1 Potato 2, Inc.*, 182 B.R. 540 (Bankr.D.Minn.1995); In re *Compuadd Corp.*, 166 B.R. 862 (Bankr.W.D.Tex.1994); *In re Appliance Store, Inc.*, 148 B.R. 234 (Bankr.W.D.Pa. 1992); *Maroon v. Four Star Pizza, Inc. (In re Four Star Pizza, Inc.)*, 135 B.R. 498 (Bankr. W.D.Pa.1992); *In re Federated Dept. Stores, Inc.*, 131 B.R. 808 (S.D.Ohio 1991); *In re Worths Stores Corp.*, 130 B.R. 531 (Bankr.E.D.Mo.1991); *In re Garfinckels, Inc.*, 118 B.R. 154 (Bankr. D.D.C.1990); *In re Revco D.S., Inc.*, 109 B.R. 264 (Bankr.N.D.Ohio 1989).

**31.** *See, e.g., In re Joseph C. Spiess Co.*, 145 B.R. 597 (Bankr.N.D.Ill.1992); *In re 1 Potato 2, Inc.*, 58 B.R. 752 (Bankr.D.Minn.1986).

**32.** In fact, under the facts as presented in the current case, Amber's may have breached the

Petula Lease pre-petition, but that issue is not before the court today.

**33.** *See, e.g., Thinking Machines Corp. v. Mellon Financial Services Corp. (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1026 (1st Cir.1995); *In re Revco Dept. Stores, Inc.*, 109 B.R. 264, 268 (Bankr.N.D.Ohio 1989) (citing *Treat Fitness Center, Inc. v. Rainbow Investment (In re Treat Fitness Center, Inc.)*, 60 B.R. 878, 879 (Bankr.9th Cir.1986).

**34.** *See, e.g., In re Joseph C. Spiess Co.*, 145 B.R. 597 (Bankr.N.D.Ill.1992).

**35.** Both Amber's and Petula agreed at the hearing that Amber's had vacated the premises and turned over the keys to Petula at least one month prior to the filing of the Bankruptcy petition by Amber's on September 8, 1995.

the court enters an order rejecting the lease, because it is the only final resolution of the issue. The parties may never know the answer independently amongst themselves, that is why § 365(a) makes review by the court a necessary step in the trustee's rejection. If the lessor re-leases the property prior to the court's order, then the lessor runs the risk of the court's denial of the motion and a situation where the lessor has entered into two contracts for the same lease space with two different parties.

■ Were the facts in this case any different, the Court could end its analysis at this point, but here the Court is faced with a dilemma. The Court concludes that the rule stated above is the right one, but under the facts in this case, where the debtor vacated the premises and turned over the keys to the landlord over a month before the petition was filed, the debtor should not be permanently penalized by the time lag between filing a motion and the entry of an order by the court. In answer to this, the Court finds that nothing precludes a bankruptcy court, based on the equities of the case, from approving the trustee's rejection of a non-residential real property lease retroactively to an earlier date.[36] This Court agrees with the First Circuit in *Thinking Machines*, when it said, "the possibility of retroactivity helps to explain the seeming rift in the case law."[37] The court's ability to grant the trustee's rejection of a lease and give the rejection a retroactive effect may help meld the reasoning in the two lines of cases that have developed in this area: an order must be entered by the court for effective rejection of a lease, but where the equities of a case warrant, the court has the power to grant the rejection retroactively.

The Court granted the rejection as of the petition date in this instance. When Amber's made its Motion to reject the Petula Lease retroactively to the petition date, the Court considered the motion and granted it based on the fact that Amber's had turned over the keys and vacated the premises pre-petition, and served a motion to reject the lease as soon as possible. The Court concludes, based on the equities of the facts in this case that retroactive rejection of the lease to the petition date was warranted.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Petula must be paid any administrative expense claim for unpaid post-petition lease obligations that occurred before the lease was rejected by Amber's and Petula need not establish its claim for administrative status under Section 503(b)(1)(A). Further, the Court finds that the date for effective rejection of a lease under § 365(a) is the date of an order by a court and not the date a motion is filed by either the trustee or the debtor. Finally, the Court finds that based on the equities of the facts in this case, the Petula Lease should be deemed rejected to the petition date for the purpose of establishing the amount of Petula's administrative claim. Therefore, since Amber's had moved-out and turned over the keys to Petula pre-petition, Petula has no administrative claim for post-petition rent payments.

A separate order will be entered consistent with this decision.

---

**36.** *Thinking Machines Corp. v. Mellon Financial Services Corp. (In re Thinking Machines Corp.),* 67 F.3d 1021, 1028 (1st Cir.1995); *Constant Limited Partnership v. Jamesway Corp. (In re Jamesway Corp.),* 179 B.R. 33, 39 (S.D.N.Y.1995); *In re Garfinckels, Inc.,* 118 B.R. 154 (Bankr.D.D.C. 1990).

**37.** *Thinking Machines Corp. v. Mellon Financial Services Corp. (In re Thinking Machines Corp.),* 67 F.3d 1021, 1028 (1st Cir.1995) (the court analyzed the decisions in cases that adopted the minority view, and found that in adopting the minority view, the courts based their decisions on the equities of the facts before them, because they first found that the trustees rejection of the lease should be effective retroactively and then followed the minority position).