**In re CAFETERIA OPERATORS, L.P., et al., Debtors.**

**No. 03–30179 HDH–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

April 21, 2003.

---

Samuel M. Stricklin, Bracewell and Patterson, Dallas, Texas, for Debtor.

Dennis J. Drebsky, Clifford Chance U.S. LLP, New York City, for Aztex Associates, L.P., and Lynx Properties Corp.

Timothy R. Casey, Gardner, Carton & Douglas, Chicago, IL, David W. Elmquist, Winstead Sechrest & Minick P.C., Dallas, Texas, for Bank One Trust Company, N.A.

Daniel C. Stewart, Vinson & Elkins, Dallas, Texas, for Fleet National Bank, Agent.

Holland N. O'Neil, Gardere, Wynne & Sewell, Dallas, Texas, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION

HARLIN D. HALE, Bankruptcy Judge.

This case presents two issues which often occur in large Chapter 11 cases—whether a master lease agreement may be rejected as to some, but not all, of the properties subject to the lease, and, if so, what is the effective date for the rejection?

The Debtors are party to a master sublease agreement which covers a number of restaurant facilities. Upon filing their bankruptcy cases, the Debtors sought to reject the master sublease agreement with respect to some, but not all, of those facilities. Some of the premises sought for rejection have been vacated by the Debtors; some are sublet to and occupied by unrelated, third-party tenants.

The Court finds that the master sublease agreement at issue is severable. Therefore, the Court approves the Debtors' request to reject the master sublease agreement in connection with certain specific locations. Further, based on the equities of the case, the Court determines that the effective date of rejection for the vacant premises should be the later of 1) the date that the motion to reject was filed or 2) the date the leased space was vacated. For the sublet premises, the date of rejection will be the date the Court approved the rejection.

### Facts

For a number of years, K Mart Corporation ("K Mart") operated cafeterias in its retail outlet stores through its wholly owned subsidiary, Furr's Cafeterias, Inc. ("Furr's"). Forty-three (43) of these cafeterias were located in retail outlets which K Mart leased from various unrelated third parties, including, among others, Aztex Associates, L.P. ("Aztex") and Lynx Properties Corp. ("Lynx").

In December 1986, Cavalcade Foods U.S.A., Inc. ("Cavalcade") entered into a Stock Purchase Agreement with K Mart, whereby Cavalcade agreed to acquire all of the shares of Furr's common stock from K Mart (the "Stock Purchase Agreement"). In conjunction with the execution of the Stock Purchase Agreement, Furr's entered into an agreement with K Mart (the "Master Sublease Agreement"), under which Furr's subleased space in the forty-three (43) locations K Mart leased from other parties, including Aztex and Lynx. Lynx was K Mart's landlord on twelve (12) of

the properties sublet by K Mart to Furr's (the "Lynx Subleases"). Aztex was K Mart's landlord on eighteen (18) of the properties sublet by K Mart to Furr's (the "Aztex Subleases").

On January 22, 2002, K Mart filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division. On July 25, 2002, Lynx and Aztex each entered into stipulations (the "Stipulations") with K Mart in the K Mart bankruptcy case that addressed treatment of certain premises leased under the Master Sublease Agreement.

The Stipulations were presented to the court as an agreed order and were approved by the bankruptcy judge. The Stipulations provide that the lessors, including Aztex and Lynx, may implement the procedures for "Alternative Disposition" of one or more of the subleases. According to the Stipulations, "[t]he Alternative Disposition shall consist of either, at the option of the [Lessors], a motion to assume and assign *one or more of the subleases on the Premises (the 'Sublease[s]')* or a motion to assume and assign one or more of the Subleases and one or more of the Leases related to such Subleases." (Stipulations § 1(iii) (emphasis added).)

Since entering into the Stipulations, Lynx and Aztex both exercised their option to implement Alternative Disposition, and on October 10, 2002, K Mart filed a motion to assume the Master Sublease Agreement with respect to the Aztex and Lynx Subleases and assign the Aztex Subleases to Aztex and the Lynx Subleases to Lynx. A hearing on this motion was held in K Mart's bankruptcy case and that Court entered an order authorizing the assumption and assignment on February 21, 2003.

On or about January 3, 2003, the instant Debtors, including the entity that now owns Furr's, filed voluntary Chapter 11 cases in this Court. On January 6, 2003, the Debtors filed motions seeking authority to reject seven of the Aztex Subleases and six of the Lynx Subleases (the "Motions") [1]. Prior to January 3, 2003, a total of 7 cafeterias operated by Debtors under the Lynx Subleases and the Aztex Subleases had been closed—4 Aztex properties and 3 Lynx properties. In addition, one location covered by the Aztex Subleases was closed on January 14, 2003. The remaining 5 properties have been sublet to other entities.

The Debtors argue that, although the Aztex Subleases and the Lynx Subleases are all contained in a single document, the Master Sublease Agreement, each location is in reality a separate lease. Aztex and Lynx objected and argued that the situation was "all or nothing," *i.e.*, that the Debtors could not choose to reject only a portion of the Master Sublease Agreement relating to specific restaurant facilities.

### Severability

Under § 365 of the Bankruptcy Code, the general rule is that the debtor must assume or reject a contract in its entirety. *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735,

---

1. Debtors also sought authority to reject the Master Sublease Agreement in connection with certain other restaurant facilities; however, determination of the issues associated with rejection of the Master Sublease Agreement in connection with those locations is not key to this Memorandum Opinion. In fact, those issues were not significantly in dispute at the hearing on Debtors' Motions. Although the Court's finding of severability in this Memorandum Opinion and any Order in connection therewith may have some peripheral determinative effect on the rejection of those locations, rejection of the Master Sublease Agreement in relation to those other locations is not addressed herein.

741 (5th Cir.1996); *In re Convenience USA, Inc.*, No. 01–81478, 2002 WL 230772, at *2 (Bankr.M.D.N.C.2002). "However, where a contract, though contained in a single document, is divisible into several different agreements, some of the divisible agreements may be assumed or rejected under § 365 without assuming or rejecting the entire contract." *In re Convenience USA, Inc.*, 2002 WL 230772, at *2 (*citing In re Gardinier, Inc.* 831 F.2d 974 (11th Cir.1987); *In re Holly's Inc.*, 140 B.R. 643, 681 (Bankr.W.D.Mich.1992); *In re Cutters, Inc.*, 104 B.R. 886, 889 (Bankr.M.D.Tenn. 1989)).

■■■ The Fifth Circuit has approved the assumption of divisible agreements, which are part of a master agreement, upon determination that the master agreement is severable. *See Stewart Title*, 83 F.3d at 739. *Stewart Title*, decided under Texas law, determined that

a contract is divisible, or severable, when one party's performance consists of more than one "distinct and separate item[ ] and the price paid by the other party is apportioned to each item." No one test or rule of law can be used to ascertain whether a contract is divisible or indivisible. Determination of the issue depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties.

*Stewart Title*, 83 F.3d 735, 739 (5th Cir. 1996) (citations omitted). A severable or divisible contract is one that "includes two or more promises each of which can be enforced separately, so that failure to perform one of the promises does not necessarily put the promisor in breach of the entire contract." Black's Law Dictionary 324 (7th ed.1999).

■■■ Courts which have analyzed the issue of severability look to the state law governing the agreement in order to deter-mine whether an agreement is divisible for § 365 assumption and rejection purposes. *See In re Convenience USA*, 2002 WL 230772, at *2; *Stewart Title*, 83 F.3d at 739; *In re Plum Run Serv. Corp.*, 159 B.R. 496, 498–99 (S.D.Ohio 1993).

■■■ In the present case, Michigan law governs the Master Sublease Agreement. On severability, the Michigan Supreme Court has held that

[a]s a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division or apportionment.

The singleness or apportionability of the consideration appears to be the principal test. The question is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned. If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items.

*Dumas v. Auto Club Ins. Assoc.*, 437 Mich. 521, 473 N.W.2d 652, 659 (1991) (*quoting City of Lansing v. Lansing Twp.*, 356 Mich. 641, 97 N.W.2d 804 (1959)).

Therefore, in order to determine whether the Master Sublease Agreement is divisible under Michigan law, the Court must evaluate whether the terms, nature, purpose and intention of the parties support the conclusion that the Master Sublease Agreement is susceptible of division or apportionment. Stated differently, the determination of divisibility "depends primarily upon the intent of the parties, the

subject matter of the agreement, and the conduct of the parties." *See In re Convenience USA,* No. 01–81478, 2002 WL 230772, at *3 (Bankr.M.D.N.C.2002).

### Severability of the Master Sublease Agreement

 In the instant case, the Master Sublease Agreement is susceptible of division. The Master Sublease Agreement, in essence, establishes common terms for 43 individual leases. Each lease is capable of standing on its own and is completely independent of the other 42 leases.

#### A. Intent of the Parties

The Master Sublease Agreement evidences the parties' intention that the individual premises' leases could be operated separately and independently of each other or even severed from the Master Sublease Agreement. Although Debtors previously made a "lump sum" basic rent payment each month[2], consideration under the Master Sublease Agreement is nonetheless apportioned among the 43 individual premises. (*See* Ex. F to Master Sublease Agreement.)

In the similar case of *Convenience USA,* the debtors sought to reject six of 27 convenience store locations under a lease. *In re Convenience USA,* 2002 WL 230772, at *1. Although decided under Texas law, the test for divisibility focused on the same general factors as applied under Michigan law. The court concluded that an examination of the lease provisions confirmed that

the intent of the parties ... was to have a contract in which the lease of the various leased properties would be divi-

sible. Such intent is reflected ... particularly [in] those provisions dealing with the transfer of leased properties during the term of the lease and the provisions dealing with allocation of rent.

*Id.* at *3. Many of the lease provisions mentioned by that court as supporting the conclusion in *Convenience USA* are in the Master Sublease Agreement before this Court as well.

For example, the lease in *Convenience USA* had a provision establishing "Rent Reduction Amounts" and the court stated that such a provision "is strongly indicative of an intent to have a divisible contract." *Id.* at *4. The Rent Reduction Amount was deducted from base rent in the event one of the leased properties was sold or destroyed. The Master Sublease Agreement in this case is also divisible for a variety of reasons with a corresponding reduction in rent. The instant Master Sublease Agreement contains similar rent reduction provisions, under certain, although somewhat limited, circumstances. (*See, e.g.,* Master Lease Agreement ¶¶ 14(b)—(c) (condemnation), ¶ 16 (noneconomic use).)

Other provisions of the Master Sublease Agreement support a finding that the parties intended the Master Sublease Agreement to be divisible. First, the primary term of the Master Lease is different for individual groups of properties. The primary term of the Aztex leases expires on December 31, 2007. The primary term on the Lynx leases expires on December 31, 2008. Another property's primary term expires on June 29, 2008. The final twelve properties' primary term expires on Janu-

---

**2.** On March 28, 2003, this Court entered an order authorizing direct payment to Aztex for rent due under the Aztex Subleases and to Lynx for rent due under the Lynx Subleases, based, in part, on the K Mart bankruptcy court's order authorizing Aztex and Lynx's assumption of their respective portions of the Master Sublease Agreement. Accordingly, Debtors no longer make a "lump sum" payment to K Mart, but instead make separate payments to the different landlords under the Master Sublease Agreement.

ary 31, 2005. (Ex. C to Master Sublease Agreement.) Debtors are required, pursuant to the terms of the Master Sublease Agreement, to surrender the premises once the term of the individual property's sublease is completed, even though the Master Sublease Agreement is in force with respect to other properties. (Master Sublease Agreement ¶ 27.)

The Master Sublease Agreement is enforceable against individual properties and does not have to be enforced in its totality. The landlord is entitled to terminate, reenter and repossess and/or relet all or part of the properties included in the Master Sublease Agreement in the event of a default. (Master Sublease Agreement ¶¶ 20(b)—(d).) The Master Sublease Agreement also contains an integration clause, which reads as follows:

38. *Integrated Sublease.* Sublessor and Sublessee acknowledge and agree for themselves, their stockholders, successors and assigns, that this Sublease is an integrated and single Sublease enforceable with respect to all or any of the Premises in accordance with its terms notwithstanding that multiple properties are covered hereby. Enforcement of the terms hereof by Sublessor with respect to any one or more of the Premises shall not affect Sublessor's ability to enforce this Sublease from time to time with respect to the remainder or any other of the Premises.

(Master Lease Agreement at p. 28.) The integration clause, coupled with the provisions allowing the landlord to terminate, re-enter and repossess or relet some, but not necessarily all, of the properties evidences the parties' intent that the Master Sublease Agreement is divisible.

Finally, the Master Sublease Agreement envisions a situation where the Debtors sublet one or more of the properties. The Master Sublease Agreement provides, in relevant part, that

40. *Release of Certain Premises.* Sublessor agrees that it will release from the terms of this Master Sublease, any Premises with respect to which Sublessor receives the following:

(i) a separate sublease of such Premises providing terms substantially as set forth herein, providing for the payment of a rental amount determined by K mark based on Exhibit F hereof, and otherwise in form and substance satisfactory to Sublessor in the exercise of its sole discretion; and,

(ii) a letter of credit issued by a financial institution acceptable to Sublessor and otherwise in form and substance satisfactory to Sublessor in the exercise of its sole discretion securing the performance by Sublessee of its payment and other obligations under the separate sublease.

From and after the date of receipt of the items set forth in (i) and (ii), this Master Sublease shall cease to be applicable to such Premises.

(Master Sublease Agreement at p. 28–9.) The effect of this provision is to sever a particular location from the terms of the Master Sublease Agreement in the event Debtors sublet the property to a third-party and provide certain documentation to landlord. The Court considers this provision to be indicative of the parties' intent that the Master Sublease Agreement is divisible.

B. *Subject Matter of the Agreement*

*Convenience USA* also supports the rationale that the subject matter and nature of the Master Sublease Agreement render it divisible. This case, like *Convenience USA,* addresses a lease for a number of separate and distinct locations scattered

over a wide area. *In re Convenience USA*, 2002 WL 230772, at *6.

> There is nothing in the evidence or in the ... Lease that suggests that the various stores cannot be operated separately and independently of each other in accordance with the provisions of the lease. It thus appears from the nature of the properties and the terms of the ... Lease that the ... Lease may be divided in separate and independent leases for one or more of the properties."

*Id.*

Similarly, in the present case, there is nothing in the evidence to show that the individual restaurant facilities cannot be operated separately and independently of each other and in accordance with the major terms and provisions of the Master Sublease Agreement. In fact, the evidence shows that the facilities do operate independently of each other and are located in different parts of the country. This type of agreement, which addresses numerous independently operated restaurant facilities scattered across multiple states, inherently lends itself to being divisible.

### C. *Conduct of the Parties*

Most importantly to the Court, in this case, is the conduct of the parties under the Master Lease Agreement. K Mart has, on several occasions, treated the Master Sublease Agreement as a divisible contract in pleadings filed in its bankruptcy case. Aztex and Lynx have not only acquiesced in such treatment, they have participated in a division of the leases before the instant bankruptcy case was filed. Finally, clearly by their actions and the Motions, the Debtors have conducted themselves as if they believe the Master Sublease Agreement is divisible.

### *Conclusion on Severability*

The Master Sublease Agreement was intended to be a divisible agreement and the considerations specified under Michigan law support a finding of divisibility. By its nature, the Master Sublease Agreement is logically divisible into 43 separate leases, and the purpose of the Master Sublease Agreement was to provide common terms for these 43 separate leases while allowing that these leases could be handled differently or severed from the Master Sublease Agreement. The intention that the Master Sublease Agreement be divisible is reflected in the terms of the agreement, particularly in the apportionment of rent that permits leases to easily be divided out of the Master Sublease Agreement for a variety of reasons. The conduct of the parties during the course of the lease also evidences their intent that the lease is divisible. Accordingly, the Court finds that the Master Lease Agreement is divisible and therefore it may be rejected in connection with some of the restaurant facilities without Debtors being forced to reject it in its entirety.

### *Judicial Estoppel*

Alternatively, principles of judicial estoppel prohibit Lynx or Aztex from asserting that the Master Sublease Agreement is not divisible. Judicial estoppel is "a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position." *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (*quoting Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988)). Judicial estoppel is an equitable doctrine that the court may invoke within its discretion; however, the "doctrine is generally applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage.'" *Id.* at 205–206 (*quoting*

*Scarano v. Central Ry. Co.,* 203 F.2d 510, 513 (3d Cir.1953)).

 The party seeking judicial estoppel need not show reliance; the purpose of the doctrine is " 'to protect the integrity of the judicial process' by 'preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.' " *Heckler v. Product Dev. Corp.,* 2002 WL 824091, at *2–3, 2002 U.S. Dist. LEXIS 7550, at *6, *8 (N.D.Tex. 2002) (*quoting Coastal Plains, Inc.,* 179 F.3d at 205) [3]. Courts have identified two basic limitations on the application of judicial estoppel: "(1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position." *Coastal Plains,* 179 F.3d at 206 (citations omitted).

 Both Lynx and Aztex represented to another Bankruptcy Court in the Stipulations that their subleases were divisible from the Master Sublease Agreement. That Court approved the potential severance of subleased premises from the Master Sublease Agreement. Were the Master Sublease Agreement an entire agreement in which the leases for each of the 43 premises were inter-related and dependant, then the Lynx and Aztex Subleases could not have been severed from the Master Sublease Agreement and assigned by K Mart.

Any argument made in this case by Lynx or Aztex that the Master Sublease Agreement is not divisible on a premises-by-premises basis is not consistent with their position in the K Mart bankruptcy case that it is possible to "assume and assign one or more of the subleases on the Premises." (Stip. and Agreed Order dated 7/30/02). Lynx and Aztex were parties to the Stipulations presented to the Bankruptcy Court for the Northern District of Illinois, and that Court approved the Stipulations. To allow Lynx and Aztex to argue in that Court to approve the severance of the Master Sublease Agreement for purposes of receiving assignment of some of the subleases and then to argue to this Court that the Master Sublease Agreement is not divisible would give Lynx and Aztex a clearly unfair advantage.

Lynx and Aztex have taken an inconsistent position in this case from their position in the K Mart bankruptcy, a position that the K Mart Court adopted. Thus, they are judicially estopped from arguing that the Master Sublease Agreement is not divisible.

### *Timing of the Rejection*

After determining that the Master Sublease Agreement is severable and may be rejected in part, the Court must now determine the effective date of the rejection. Debtor argues that it is entitled to retroactive rejection to the petition date because the rejected locations have either been vacated or are sublet to third parties in an amount equal to or less than Debtors' rent obligation for the individual locations under the Master Sublease Agreement. Aztex and Lynx argue that the rejection, if any, should be effective on the date this Court signs the order allowing rejection.

3. In the present case, the use of the phrase "fast and loose" may lead one to come to an incorrect conclusion regarding Lynx and Aztex. Counsel for Lynx and Aztex appears to be effectively representing his clients before two different courts. Aztex and Lynx's positions before the respective Courts are antagonistic to each other and the rule of judicial estoppel must be applied. By so ruling and following the applicable standard, no aspersions are cast on counsel for Lynx and Aztex, who has been quite forthcoming with this Court.

 The general rule in this Circuit is that the effective date of a rejection is the date of the entry of the bankruptcy court's order approving lease rejection. *In re Amber's Stores, Inc.,* 193 B.R. 819, 826–27 (Bankr.N.D.Tex.1996) (Abramson, J.); *see also Arizona Appetito's Stores, Inc. v. Paradise Vill. Inv. Co.,* 893 F.2d 216, 219 (9th Cir.1990); *In re Thinking Machines, Corp.,* 67 F.3d 1021, 1025 (1st Cir.1995). This general rule provides certainty and guides the parties' actions after the case has been filed.

 However, "nothing precludes a bankruptcy court, based on the equities of the case, from approving the ... rejection of a non-residential real property lease retroactively to an earlier date." *In re Amber's Stores, Inc.,* 193 B.R. at 826–27; see also *In re Thinking Machines, Corp.,* 67 F.3d 1021, 1028 (1st Cir.1995). In *Amber's Stores,* the debtor had vacated the premises and relinquished the keys prior to the filing of debtor's bankruptcy. The Court allowed retroactive rejection to the date the motion was filed based on the equities of the case.

 In the present case, the Debtors sought to reject by filing its Motions with the Court immediately after the bankruptcy case was filed. The Debtors had closed and otherwise turned over possession of 7 of the 12 properties subject to the Master Sublease Agreement before the bankruptcy proceedings. The Debtors subsequently closed 1 additional location approximately one week after filing their Motions.

With respect to the closed locations, the Court finds that the equities of the case allow rejection retroactive to the later of 1) the date Debtors' Motions were filed or 2) the date the leased space was vacated because "the debtor should not be permanently penalized by the time lag between filing a motion and the entry of an order by the court." *Amber's Stores,* 193 B.R. at 827. The Debtors are receiving no benefit from the leased properties and by vacating the leased locations, Aztex and Lynx had unequivocal notice of Debtors' intent to reject prior to the filing of the Motions.

With respect to the remaining 5 sublet locations, the Debtors have been receiving rents for these locations. The equities of the case do not weigh so heavily in Debtors' favor to allow retroactive rejections. The locations are occupied and the subtenants have continuously paid rent. Therefore, the Master Sublease Agreement with respect to those properties will be rejected as of the date this Court allowed rejection.

### Conclusion

The Master Sublease Agreement is divisible on its face. Therefore, Debtor may reject a portion of the Master Sublease Agreement relating to individual locations without having to reject the lease in its entirety. In addition, Aztex and Lynx are judicially estopped from denying that the Master Sublease Agreement is divisible. Finally, the Master Sublease Agreement is rejected retroactive to 1) the date of Debtor's motion to reject with respect to the 7 locations closed as of the date of the Motion, 2) January 14, 2003 with respect to the location closed on that date, and 3) as of the date the Court allowed rejection of the Master Sublease Agreement with respect to the sublet locations.