**In re ZB COMPANY, INC.
et al., Debtors.**

Nos. 03–13672, 03–13674 to
03–13676, 03–13678.

United States Bankruptcy Court,
D. Delaware.

Dec. 17, 2003.

■■■■■■■

Kimberly D. Newmarch, Mark D. Collins, Rebecca L. Booth, Richards, Layton & Finger, Wilmington, DE, for Debtors.

Gregory W. Werkheiser, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Creditor Committee.

## MEMORANDUM OF DECISION WITH RESPECT TO (1) CASH COLLATERAL MOTION [# 16] AND (2) GOB SALE MOTION [# 17]

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter originally came before the Court for hearing on the Motion of Debtors and Debtors in Possession Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code and Rule 4001(b) of the Bankruptcy Rules for (A) Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Providing for Adequate Protection; and (B) Scheduling a Further Hearing with Respect to Continued Use of Cash Collateral (the "Cash Collateral Motion") [# 16], filed along with several other motions when the petitions were filed, and the Limited Objection (the "Objection") [1] thereto. The Cash Collateral Motion and Objection raised several issues of concern to the Court and various parties, including whether the Debtors may collect from a third party money intended as rent for the period from December 4, 2003 to December 31, 2003 (the "Stub Period") but use that money to fund other obligations of the Debtors. At the continued hearing on the Cash Collateral Motion, and certain other first day motions, including the "GOB Motion," the Debtors agreed to pay the rent for the Stub Period in order to resolve their landlords' objections to both the Cash Collateral and GOB Motions. The Court approved the Cash Collateral and GOB Motions as modified and now writes to address the question of the payment of rent during the Stub Period as this issue is a common one in Chapter 11 proceedings.

## I. BACKGROUND

The debtors, FAO, Inc., FAO Schwartz, Inc., ZB Company, Inc., Targoff–RS, LLC, and the Right Start, Inc. (the "Debtors"), filed previous voluntary Chapter 11 petitions (Case Nos. 03–10119 through 03–10122) (the "Previous Chapter 11 Cases") on January 13, 2003.[2] The Previous Chapter 11 Cases were confirmed and the plan substantially consummated. Unfortunately the reorganized entities were not as successful as predicted and on December 4, 2003 (the "Petition Date") the Debtors filed the instant Chapter 11 cases with the intention of liquidating their assets.

Prior to the instant filings, the Debtors, with input from their trade creditors, solicited proposals from various liquidators, negotiated a "stalking horse" agreement with one, and ultimately after soliciting competing bids, entered into the liquidating

---

1. The Objection was filed by six landlords. Subsequently six other landlords joined in the Objection. Prior to the hearing, additional landlords filed objections to the GOB Motion, as hereinafter defined, and in those objections, raised objections to the portion of the Cash Collateral Motion at issue herein. All of the objecting landlords are collectively referred to herein as the "Landlords."

2. Zany Brainy, Inc., the predecessor to ZB Company, filed a Chapter 11 (Case No. 01–1749) less than three years ago, approximately a year and a half prior to its Previous Chapter 11 Case.

agreement (the "Liquidation Agreement") between the Debtors and a joint venture group (the "Agent")[3] currently before the Court. The Liquidation Agreement[4] provides that the Agent will run store closing, going out of business, and "soft" sales (collectively, the "GOB Sales") and further provides, among other things, that the Agent is unconditionally responsible for the "Expenses of the Sale" which include occupancy expenses. Under the same Agreement the Debtors have the right to take back some or all of the stores from the Agent. If that happens, the Agent's responsibility to pay the expenses of the sale with respect to any stores removed from the GOB Sale terminates.

As of the Petition Date the Debtors operated 142 stores located in 29 states. All stores are leased from third party landlords. For virtually all of these locations, the rental contract provides that the rent is due monthly, in advance, on the first of the month. The rent that was due and owing on December 1, 2003, prior to the Petition Date, was not paid. The rent calculated on a per diem basis for all of the Debtors' locations exceeds $123,000. Rent for the Stub Period is approximately $3.5 million (the "Stub Period Rent"). The Liquidation Agreement calls for the Agent to reimburse the Debtors for the Stub Period Rent and, from the budget included in the Cash Collateral Motion, it appears that the Agent is paying this amount to the Debtors as required. The budget initially proposed, however, included the Stub Period Rent within the Debtors' operating revenue but made no provision for the Debtors to pay that money over to their landlords. The Debtors' and lenders' intention was that the Debtors would use this money as part of the operating revenue to pay other expenses.

## II. POSITION OF THE PARTIES

### A. The Debtors' Position

Prior to the settlement, the Debtors argued that neither the law nor the facts of this case compelled them to pay the Stub Period Rent prior to confirmation. They noted that proration of rent is impermissible in this circuit and thus section 365(d)(3) of the Bankruptcy Code is inapplicable. *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir.2001). The Debtors conceded, however, that the Landlords, indeed all of their landlords, have administrative expenses claims for the postpetition use and occupancy of the stores. *In re HQ Global Holdings, Inc.*, 282 B.R. 169 (Bankr.D.Del.2002). Nevertheless they argued that now was not the time to pay those claims. They represented that they intend to engage a broker to assist in marketing their leases; if and when they seek to assume any leases, the Stub Period Rent would be paid as part of the cure amount and thus the issue of payment of the Stub Period Rent disappears for any lease that is ultimately assumed. Moreover they claimed that until they decide which leases to assume and

---

**3.** The Agent group consists of SB Capital Group, LLC, Buxbaum Company, LLC, and Tiger Group, LLC.

**4.** The Liquidation Agreement was approved by this Court as part of the Motion of Debtors and Debtors in Possession for Entry of an Interim and Final Order (I) Authorizing the Assumption of Agency Agent with Liquidating Agent, (II) Authorizing the Retention of Liquidating Agent Pursuant to Section 328 of the Bankruptcy Code, (III) Authorizing the Debtors to Continue to Conduct "Store Closing Sales," "Going out of Business" and "Soft" Sales Pursuant to Section 363(B), (F), and (M) of the Bankruptcy Code Free and Clear of All Liens, Claims and Interests, and (IV) Authorizing Lease Rejection Procedures with Respect to Designated Closing Locations Pursuant to Section 365(a) of the Bankruptcy Code (the "GOB Sale Motion").

which to reject, it is difficult to know the amount of the Stub Period Rent for each lessor. Finally they argued that the proposed budget incorporated into the Cash Collateral Motion did not permit them to pay the Stub Period Rent; they alleged that their postpetition lenders agreed to that budget on the assumption that section 365(d)(3) would not mandate the immediate payment of these expenses.

### B. The Landlords' Position

The Landlords objected and sought an order compelling the Debtors or the Agent to pay use and occupancy charges, presumably at the contract rate, on at least a weekly basis. They note that the fact that the Agent is actually funding these expenses, on a *per diem* basis, distinguished this situation from the *Montgomery Ward* and *HQ Global Holdings* cases.

## III. DISCUSSION

### A. Section 365(d)(3)

 In pertinent part, 11 U.S.C. § 365(d)(3) provides that a "trustee shall timely perform all the obligations of the debtor, except those specified in § 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding § 503(b)(1)." Although courts are split on the issue of whether the timely performance of obligations required by section 365(d)(3) permits proration of rent on a per diem basis between pre and post-petition of a stub period, the law is clear in this circuit. Proration, not otherwise provided for in the contract, is prohibited. *Montgomery Ward Holding Corp.*, 268 F.3d at 209.

> The clear and express intent of § 365(d)(3) is to require the trustee to perform the lease in accordance with

its terms. To be consistent with this intent, any interpretation must look to the terms of the lease to determine both the nature of the "obligation" and when it "arises." If one accepts this premise, it is difficult to find a textual basis for a proration approach. On the other hand, an approach which calls for the trustee to perform obligations as they become due under the terms of the lease fits comfortably with the statutory text.

*Id. See also HQ Global Holdings, Inc.*, 282 B.R. at 172.

### B. Section 503(b)(1)(A)

 That proration of rent is not permitted under section 365(d)(3) does not leave the Landlords without a remedy, however. Section 503(b)(1)(A) grants an allowed administrative claim for "the actual, necessary costs and expenses of preserving the estate...." Section 503(b)(1)(A) fills the stub period gap created by section 365(d)(3).

It is beyond dispute that all of the Debtors' landlords whose properties are occupied and used post-petition have valid administrative claims. *HQ Global Holdings*, 282 B.R. at 173. The only issues to be decided are the amount of the claims and when the section 503(b)(1)(A) claims of all of the landlords should be paid.

Absent evidence to the contrary, the contract rate is presumed to be the fair rental value. *Id.* at 174. In the instant case, the Debtors did not offer any evidence that the contract rates should not apply. In fact there is nothing to suggest that the amount which the Debtors propose to collect from the Agent because of the Agent's obligation to pay the occupancy expenses is based upon anything but

the contract rates.[5] Instead the Debtors claimed that at this point in the case, they do not know when or if a particular lease is to be rejected. That a particular lease might be rejected before the end of the Stub Period does not prevent the Debtor from paying such a landlord his occupancy charges on a *per diem* basis. There is no prohibition against prorating these administrative expenses in section 503(b)(3).

The timing of the payment of an administrative expense is within the Court's discretion. *HQ Global Holdings, Inc.*, 282 B.R. at 173. In this case there is no justification for not paying the rent owed to the landlords when the Agent is paying those expenses and will continue to be responsible for those payments unless and until a particular store is removed from the Liquidation Agreement. Congress never intended that a debtor shift the responsibility to pay an administrative rent claim to a third party and then intercept and divert the funds for its own purposes. There is always the potential that a claimant could be left with an allowed administrative claim against an administratively insolvent estate. This Court will not permit such behavior.

## CONCLUSION

Because the Debtors modified the Cash Collateral Motion to provide for the payment of the Stub period rent upon receipt of that rent from the Agent, the Cash collateral Motion was approved as modified.

A separate order has issued.

---

5. It is possible that some of the store locations may be downsized or even closed during the Stub Period. Should either contingency occur, the Debtors or the Agent may seek further orders as necessary.