In re CHI–CHI'S, INC., et al., Debtors.

No. 03–13063 CGC.

United States Bankruptcy Court,
D. Delaware.

Feb. 2, 2004.

Laura Davis Jones, Bruce Grohsgal, Rachel Lowy Werkheiser, Sandra G. McLamb, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, William N. Lobel, Alan J. Friedman, Mike D. Neue, John P. Schafer, Irell & Manella LLP, Newport Beach, CA, for Debtors and Debtors in Possession.

Tobey Marie Daluz, Jennifer A.L. Kelleher, Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, DE, David L. Pollack, Jeffrey Meyers, Dean Waldt, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for General Growth Management, Inc.

## MEMORANDUM DECISION

CHARLES G. CASE, II, Bankruptcy Judge.

Before this Court is General Growth Management's [1] Objection (Docket No. 136) to Chi–Chi's, Inc.'s Motion for Order Authorizing Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(a) of the Bankruptcy Code. (Docket No. 10). The first issue presented to this Court is whether the Petition Date is the appropriate day to deem the Landlords' leases rejected when the property was not surrendered to the Landlord until after the filing of Chi–Chi's petition. The second issue presented to this Court is whether Chi–Chi's, Inc. should be ordered to pay to its Landlords amounts received or owed by it under subleases/sub-subleases, where the Landlords have no direct interest in the subleases/sub-subleases and where the payments relate to a "stub period" arising after the filing of Chi–Chi's petition. For the following reasons, the Court grants in part and denies in part the relief Landlords request.

## BACKGROUND

On October 8, 2003, (the "Petition

---

1. General Growth Management, Inc., as agent for the owners of Spring Hill Mall ("Spring Hill") and Golf Mill Shopping Center ("Golf Mill") (collectively the "Landlords").

Date") Chi–Chi's, Inc.[2] (the "Debtors") filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

The Court granted the Debtors' Motion for an Order Authorizing the Debtors to Reject Certain Unexpired Leases of Non-residential Real Property Pursuant to Section 365(a) of the Bankruptcy Code (the "Motion") on October 9, 2003. (Respectively, Docket Nos. 10, and 25). The leases subject to the motion were deemed rejected as of the Petition Date. The Debtors filed an Amended Notice of Entry of the Order. (Docket No. 49).

Among the leases rejected, in the Motion, were restaurants located at Spring Hill (the "Spring Hill Lease"), and Golf Mill (the "Golf Mill Lease"), which were previously operated by the Debtors pursuant to leases with the Landlords.

### A. *The Spring Hill Lease*

The Spring Hill Lease was sublet by the Debtors to Shell's Seafood Restaurant, Inc., on or about July 7, 1998. By agreement, the Spring Hill Landlord consented to the sublet of the premises on or about August 24, 1998. The Spring Hill Lease was subsequently sublet by Shell's Seafood Restaurant, Inc., the sublessee/sub-sublessor, to Famous Dave's of Ribs–U, Inc. ("Famous Dave's"), the sub-sublessee. By agreement, the Spring Hill Landlord consented to the sub-sublease on October 19, 2003. Pursuant to that agreement, if either the lease or sublease is terminated

prior to the scheduled expiration date of the lease, Famous Dave's will attorn to the Spring Hill Landlord and will become a direct tenant of the landlord without the necessity of executing a new lease.

The Spring Hill Landlord has not received rent for October 2003, and Famous Dave's has not remitted payment to the Debtors for the October 2003 rent.

In addition, the Spring Hill Landlord billed the Debtors for 2002 year-end adjustments totaling $26,354.91. Although, the Spring Hill Landlord has not received payment, it is unclear whether the Debtors or Famous Dave's is ultimately responsible for the adjustments. In addition, it is unclear whether the Debtors received payment for the adjustments from Famous Dave's.

### B. *The Golf Mill Lease*

The Golf Mill Lease was sublet, under a sublease agreement, to Mei Ji Zheng and Yi Zhao Zheng t/a King's Buffet ("King's Buffet") on June 17, 2002, to which the Golf Mill Landlord consented.

The Golf Mill Landlord has not received rent for October 2003, however, payment of rent was made directly to the Debtors.

The Golf Mill Sublease provided that the tenant may remain in the premises, and be required to attorn to the landlord, in the landlord's discretion; it did not provide for an automatic attornment. According to the Golf Mill Landlord, it is unclear whether this sublease was assigned or sublet to parties other than the original sublessee. In addition, the rent payable under the sublease is in excess of those required under the Debtors' original lease. Subse-

---

2. The Debtors consist of the following entities: Chi–Chi's, Inc., CCMR of Catonsville, Inc., CCMR of Cumberland, Inc., CCMR of Frederick, Inc., CCMR of Greenbelt, Inc., CCMR of Hartford County, Inc., CCMR of Maryland, Inc., CCMR of Ritchie Highway, Inc., CCMR of Timonium, Inc., Chi–Chi's of West Virginia, Inc., CMM Dissolution, Inc., Koo Koo Roo, Inc., Maintenance Support Group, Inc., and Koo Koo Roo Licensing Systems, Inc.

quent to the Debtors' Petition Date, the landlord has agreed to a month-to-month lease with the current tenant, King's Buffet.

## C. Landlords' Requested Relief

The Landlords seek an Order whereby the Debtors (1) reject and terminate the Leases and subleases/sub-subleases, as well as any interest the Debtors have in the subleases/sub-subleases, (2) agree to pay the rents it received for October 2003 to Landlords, and/or (3) assignment of rents due and unpaid for October 2003. In the alternative, the Golf Mill Landlord seeks relief from the automatic stay in order to terminate the lease with the Debtors provided that the Debtors accept the termination and agree to terminate the sublease. In addition, the Landlords request that the Court deny the Debtors' Motion as to the Landlords' leases and enter a rejection date other than the Petition Date.

Oral argument was heard on the Landlords' objections to the Debtors' Motion at the January 12, 2003 omnibus hearing and at the request of this Court on January 16, 2003.

## JURISDICTION

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O).

## DISCUSSION

### I. Retroactive Rejection of Nonresidential Leases:

Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Court of Appeals for the First Circuit, in In re Thinking Machines Corp., 67 F.3d 1021,

1025 (1st Cir.1995) held that language of § 365(a) makes court approval a condition precedent to the effectiveness of a trustee's rejection of a nonresidential lease, and thus, the date of court approval controls. In re Thinking Machines Corp., 67 F.3d 1021, 1025 (1st Cir.1995). However, the court ruled that the bankruptcy court has discretion to approve a rejection of a nonresidential lease pursuant to § 365(a) retroactive to the motion filing date, when principles of equity so dictate. Id. at 1028. Moreover, the court's power to grant retroactive relief is derived from the bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a). Id. Thus, only after balancing the equities in a particular case, should the court approve a retroactive rejection of nonresidential lease.

Here, the Landlords take the position that rejection should not be deemed as of the Petition Date, since the Debtors had not surrendered the premises to the Landlords. The premises are subject to subleases/sub-subleases, and the current tenants remain on the premises. It was not until a few weeks after the order was entered that the Landlords were able to enter into agreements with the sublessees/sub-sublessees.

Based on the foregoing, the Court finds that it will not exercise its equitable power to deem the Landlords' leases rejected as of the Petition Date. The more appropriate date is the day the Debtors surrendered the premises to the Landlords, and the Landlords were able to enter into agreements with the current tenants. The rejection date thus should be at the earliest, October 31, 2003.

### II. Payment of 2002 Year–End Adjustments:

Section 365(d)(3) directs the trustee, in a timely fashion, to "perform all the

obligations of the debtor...arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3). The Spring Hill Landlord alleges that it is owed $26,354.91 for 2002 year-end adjustments which were billed to Chi–Chi's but remains unpaid. In *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir.2001), the Third Circuit required the debtors to pay the full year's taxes, regardless of when such taxes accrued, because Section 365(d)(3) requires a debtor to perform all leasehold obligations as they come due. *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir.2001). In that case, the debtors' lease obligation for tax payments arose post-order and prior to the rejection of the landlord's lease. The court stated that the tax payments were an obligation required to be performed under the terms of the lease and the obligation arose when one became legally obligated to perform. *Id.* The Court relied on *In re Columbia Gas Transmission Corp.*, 37 F.3d 982 (3d Cir.1994), where it observed "that a tax liability is generally 'incurred on the date it accrues, not on the date of the assessment or date on which it is payable.'" *Montgomery Ward*, 268 F.3d at 212, *quoting, In re Columbia Gas Transmission Corp.*, 37 F.3d 982, 985 (3d Cir.1994).

Similarly, in this case, if the 2002 year-end assessment came due post-petition and pre-rejection, the Debtors are required to pay the assessment under *Montgomery Ward*. However, if the objection arose pre-petition or post-rejection, the assessment is part of the Landlords' unsecured claim.

### III. *Payment of Stub Period Rent:*

Both parties agree that the Debtors are not required under Section 365(d)(3) to pay the stub period rent. *In re Montgomery Ward Holding Corp.*, 268 F.3d 205. However, the Landlords argue that equity requires the payment because it would be unfair to allow the Debtors to retain funds paid for the specific purpose of satisfying its obligations to its Landlords. The Landlords rely on Judge Rosenthal's opinion in *In re ZB Company, Inc., et al.*, 302 B.R. 316 (Bankr.D.Del.2003). The Debtors argue that the Landlords' appropriate remedy is to file an administrative claim which, when and as allowed, would then be paid in the same manner as other similarly situated claims.

In the *In re ZB Company* case, the Debtors operated 142 stores which were leased from third party landlords. For almost all of those stores, the rental contracts provided that the Debtors would pay rent monthly, in advance, on the first of the month. The December 1, 2003 rent that was due and owing, prior to the Petition Date, was not paid. Pursuant to the Debtors' Liquidating Agreement with the Agent responsible for conducting going-out-of business sales, the Agent agreed to pay the stub period rent. The rent for the stub period was approximately $3.5 million. According to the Debtors' Cash Collateral Motion budget, it appeared that the stub period funds were budgeted within the Debtors' operating revenue and instead of being paid to the landlords, the funds would be used to pay other expenses. Thus, since the Agent was paying occupancy expenses, and the leases were not rejected, the Debtors were not prevented from paying the landlords' occupancy charges on a per diem basis.

In *In re ZB Company*, this Court held that:

> there is no justification for [the Debtors] not paying the rent owed to the landlords when the Agent is paying those expenses and will continue to be responsible for those payments unless and until

a particular store is removed from the Liquidation Agreement. Congress never intended that a debtor shift the responsibility to pay an administrative rent claim to a third party and then intercept and divert the funds for its own purposes. There is always the potential that a claimant could be left with an allowed administrative claim against an administratively insolvent estate. This Court will not permit such behavior.

*Id.* at 319. Although this Court agrees with Judge Rosenthal's decision, it does not apply in this case because the facts here are distinguishable.

 In this case, Chi–Chi's sought rejection of the leases, effective as of the Petition Date, and Chi–Chi's is not the tenant of the leased space; subtenants currently occupy the leased premises and pay rent to Chi–Chi's who is responsible for paying rent to the Landlords. Here, one of the subtenants has not paid the October 2003 rent; the other subtenant made timely rental payment to the Debtors which was not remitted to the Landlords. In addition, the rent owed for the stub period is approximately $60,000. Furthermore, there is no indication that the Debtors have budgeted these funds to pay other expenses. The Debtors are not receiving payment for occupancy expenses. Moreover, there is no indication that this estate is administratively insolvent.

The timing of payment of a lease-based administrative claim was addressed by Judge Walrath in *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr.D.Del. 2002):

> Section 503 provides that an entity can request payment of an administrative expense which may be allowed after notice and a hearing. 11 U.S.C. § 503(a)–(b). Section 503, however, does not address the question of when a claim for administrative expense is to be paid.

*See, e.g., In re Standard Furniture*, 3 B.R. 527, 532 (Bankr.S.D.Cal.1980). The determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court. *See, e.g., In re Colortex Industries, Inc.*, 19 F.3d 1371, 1384 (11th Cir.1994); *In re Verco Industries*, 20 B.R. 664, 665 (9th Cir. BAP 1982); *In re Baptist Medical Center of New York, Inc.*, 52 B.R. 417, 421 (E.D.N.Y.1985). In making this determination, one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets. *Id.* Thus, distributions prior to confirmation of a plan are usually disallowed when the estate may not be able to pay all administrative expenses in full. *Standard Furniture*, 3 B.R. at 532. Other factors include the particular needs of each administrative claimant and the length and expense of the case's administration. *See, e.g., In re Reams Broadcasting Corp.*, 153 B.R. 520, 522 (Bankr.N.D.Ohio 1993); *In re Barron*, 73 B.R. 812, 814 (Bankr.S.D.Cal.1987).

*In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr.D.Del.2002).

In this case, the Debtors sought to reject the Spring Hill and Gold Mill leases as of the Petition Date. The Landlords have entered, or will enter, into direct arrangements with the respective sublessee or sub-sublessee for continued occupancy or will receive from the Debtors the assignment of amounts due under the respective sublease or sub-sublease where they have not yet been paid. The only issue that remains relates to amounts already paid for the stub period for these rejected leases.

Here, the Debtors will soon monetize its assets and proceed to claim resolution and eventual payment under a plan, assuming such a plan is confirmed. The eventual

payout to creditors generally, and administrative claimants in particular, is not yet known. Under these circumstances, the result most consistent with bankruptcy policy is for the Landlords to be treated like any other administrative claimant, particularly since there is no legal basis asserted for a "trust" in its favor over the stub paid funds or a direct right of collection against the sublessees/sub-sublessees. Therefore, the Landlords' motion for immediate payment will be denied; the Landlords' appropriate remedy is to file an administrative claim.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Landlords' request for immediate payment of rents owed pursuant to its sublease with the Debtors.

Counsel for the Landlords is to submit a form of order for the Court's signature.