In re AT HOME CORPORATION, a
Delaware corporation, Debtor.

Pacific Shores Development,
LLC, Appellant,

v.

At Home Corporation, dba Excite
at Home, Appellee.

No. 03–15769.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 2004.

Filed Dec. 28, 2004.

Nicholas B. Waranoff, Allen, Matkins, Leck, Gamble & Mallory, San Francisco, CA, for the appellant.

Brian M. Metcalf, O'Melveny & Myers, Los Angeles, CA, for the appellee.

Before: CYNTHIA HOLCOMB HALL, MELVIN BRUNETTI, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

In this appeal, we hold that a bankruptcy court may approve retroactively the rejection of an unexpired nonresidential lease. We adopt the First Circuit's conclusion in *Thinking Machines Corp. v. Mellon Financial Services Corp. # 1 (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1029 (1st Cir.1995): although rejection of an unexpired nonresidential lease does not take effect until court approval, "the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively." We further hold that the retroactive date may be earlier than the date on which the landlord retakes possession of the premises. Here,

the bankruptcy court permissibly allowed the debtor to reject the leases as of the date on which the debtor filed its motion seeking to reject them. Accordingly, we affirm.

## BACKGROUND

In happier times, Debtor At Home Corporation was actively engaged in the delivery of "broadband" network services to residential customers. As part of an aggressive growth strategy, in early 2000 Debtor leased two buildings from Pacific Shores Development Corporation, LLC. Debtor placed in escrow approximately $20 million to fund the remodeling of the two leased buildings. Debtor intended to occupy the premises upon completion of the renovation.

But things did not go as planned. Debtor filed for Chapter 11 bankruptcy protection on September 28, 2001. Although the renovation was "virtually complete" by then, Debtor had never occupied the leased buildings. Debtor did not furnish Pacific Shores with a formal surrender notice before seeking protection under Chapter 11; it feared that Pacific Shores would convert more than $1 million, which remained in the escrow account for remodeling, into rent. Indeed, that conversion apparently took place on the same day that Debtor filed its bankruptcy petition.

Also on that same day, Debtor filed an "Emergency Motion for Order Pursuant to 11 U.S.C. § 365(a) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property." That motion sought an order rejecting the leases *nunc pro tunc* to September 28, the date on which the motion was filed. Pacific Shores did not quarrel with the decision to reject the leases, but objected to the motion "to the extent it seeks retroactive rejection of [the] leases." The parties contested this point because the effective date of rejection of the leases governed whether Debt-or would owe Pacific Shores more than $1 million in additional rent.

During the "first day emergency motions" hearing on October 1, 2001, Debtor asked the court to schedule a hearing on its motion to reject the leases "early next week." On October 1 a committee of creditors had not yet formed. Because the following Monday was a court holiday, the bankruptcy court scheduled the hearing for Tuesday, October 9, 2001.

At the October 9 hearing, the bankruptcy court heard argument from Pacific Shores, Debtor, the United States trustee, and the newly formed creditors' committee. The bankruptcy court then rendered an oral decision in which it concluded that a *nunc pro tunc* order was appropriate because: (1) Debtor moved to reject the lease immediately upon filing its bankruptcy petition; (2) Debtor set the matter for hearing promptly; (3) Debtor was "not in possession of the premises"; and (4) Pacific Shores opposed *nunc pro tunc* rejection without having suggested "that this process should be speeded up so that [Pacific Shores] could get ... its indefeasible right to re-let the premises." In other words, Pacific Shores's sole "interest [was] in running the administrative rent." The court later issued a written order approving the retroactive rejection of the leases.

Pacific Shores challenged the bankruptcy court's order in district court. The district court affirmed the bankruptcy court in a published opinion. *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 292 B.R. 195 (N.D.Cal.2003). Relying on *Thinking Machines*, the district court held that 11 U.S.C. § 365(d) permits a bankruptcy court to order the rejection of a nonresidential lease retroactive to an earlier date, whether or not the landlord was in possession of the leased premises on that date. *Id.* at 202. The court also held that, on the facts of this

case, the bankruptcy court did not abuse its discretion by approving Debtor's rejection of its leases retroactive to the September 28 filing date. *Id.* at 204. Pacific Shores timely appealed to this court.

## STANDARDS OF REVIEW

We conduct an independent review of a bankruptcy court's decision. *Brewer v. Erwin & Erwin, P.C. (In re Marquam Inv. Corp.)*, 942 F.2d 1462, 1465 (9th Cir.1991). We review for abuse of discretion a bankruptcy court's entry of a *nunc pro tunc* approval of a motion. *Atkins v. Wain, Samuel & Co. (In re Atkins)*, 69 F.3d 970, 973 (9th Cir.1995). A court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact. *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020 (9th Cir.2002).

## DISCUSSION

Pacific Shores agrees that, as a general matter, a bankruptcy court may exercise its equitable powers to approve the rejection of a nonresidential lease retroactively. Nonetheless, Pacific Shores contends that the bankruptcy court erred in two respects. First, Pacific Shores argues that the bankruptcy court lacked authority to approve the rejection of the leases to a date *before* the date on which Pacific Shores, as landlord, regained possession of the premises. Second, Pacific Shores takes issue with the factors on which the bankruptcy court relied in granting Debtor's motion.

Our task is to identify the authority for, and the limits of, a bankruptcy court's discretion in this context. We will begin by analyzing 11 U.S.C. § 365(d), which

controls the treatment of unexpired nonresidential leases in Chapter 11 proceedings, and the cases discussing the effective date of lease rejection under the statute. We then will turn to an analysis of the bankruptcy court's decision.

A. *Equitable authority under 11 U.S.C. § 365(d).*

  1. *The Shopping Center Amendments changed the treatment of unexpired nonresidential leases in Chapter 11 bankruptcy proceedings.*

The parties' dispute turns on the text and purpose of 11 U.S.C. § 365(d), which sets forth a debtor's duties under a nonresidential lease once the debtor has filed for bankruptcy protection. The relevant subsections of § 365(d) provide:

(3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, not-withstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period.... Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(4) ... [I]n a case under any chapter of this title, if the trustee [1] does not assume or reject an unexpired lease of nonresidential real property under which the

---

**1.** Although § 365(d) refers to the "trustee," courts have held that either the trustee or the debtor may move for an order rejecting an unexpired noncommercial lease. *See, e.g., In re Amber's Stores, Inc.*, 193 B.R. 819, 826 (Bankr.N.D.Tex.1996). In a Chapter 11 bankruptcy, a debtor-in-possession performs essentially all the functions of a trustee. 11 U.S.C. § 1107(a); *Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 849 (9th Cir.2001).

debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(3)-(4).

Those subsections impose two obligations on a trustee or debtor with respect to unexpired nonresidential leases. First, § 365(d)(3) makes clear that the debtor must perform all obligations owing under a lease—particularly the obligation to pay rent at the contract rate—until the lease is rejected. Second, § 365(d)(4) requires a debtor or trustee to decide whether to assume or reject a lease within 60 days after the filing of a bankruptcy petition. If the trustee fails to act within 60 days, the lease is "deemed rejected" and the trustee must "immediately surrender such nonresidential real property to the lessor." 11 U.S.C. § 365(d)(4).

Those duties arose out of the so-called "Shopping Center Amendments" contained in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984). Through those amendments, Congress sought to protect the interests of commercial landlords who, compared to other creditors, were unfairly disadvantaged because they were forced to continue extending credit—in the form of rent—during the pendency of reorganization proceedings. *See* 130 Cong. Rec. S8891 (1984), *reprinted in* 1984 U.S.C.C.A.N. 590, 598–99 (statement of Sen. Hatch) (discussing problem).

Specifically, Congress enacted the Shopping Center Amendments to tackle two main problems. "The first problem which [the Amendments] would remedy is the long-term vacancy or partial operation of space by a bankrupt tenant." *Id.* at 598. Previously, a debtor could file a Chapter 11 bankruptcy petition and then maintain control of the leased property for the entire duration of the bankruptcy proceedings, even if the debtor had ceased operations and had vacated the premises. The *automatic stay* prevented the landlord from evicting the debtor or regaining possession of the leased space. The landlord lost money, and the extended vacancy hurt other tenants in the same shopping center as the bankrupt tenant because of decreased customer traffic. *Id.* at 599.

"A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease." *Id.* Again, this problem affected both the landlord and the other shopping-center tenants. "[T]he landlord [was] forced to provide current services—the use of its property, utilities, security, and other services—without current payment." *Id.* Other tenants could be required to increase their "common area charge payments" to make up for the fact that the bankrupt tenant was no longer contributing to common area charges. *Id.* The landlord eventually received only the court-determined "actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1)(A), rather than the rent that would have been due under the terms of the lease. Thus, landlords could not rent the unused space until the proceedings terminated, and they received only "an amount equal to the reasonable value of the debtor's actual use and occupation of the property" during those proceedings. *Towers v. Chickering & Gregory (In re Pacific–Atlantic Trading Co.),* 27 F.3d 401, 403 (9th Cir.1994).

The Shopping Center Amendments solved those two problems by ensuring that a commercial tenant who seeks protection under Chapter 11 continues to per-

form its obligations under the lease—including the obligation to pay the full amount of rent "notwithstanding section 503(b)(1)"—until the lease is rejected. By requiring the tenant to pay administrative rent until it rejects the lease, and by providing for automatic rejection of the lease after 60 days, the Amendments ensure that the tenant determines promptly whether to assume or reject the lease, rather than taking advantage of the automatic stay.

2. Thinking Machines *appropriately recognized bankruptcy courts' equitable authority under 11 U.S.C. § 365(d).*

■ Soon after Congress enacted the Shopping Center Amendments, courts began to arrive at contrary conclusions with respect to when a lease rejection takes effect. Much depends on that conclusion, because the effective date of rejection determines when a debtor's obligation to pay rent ceases. Under the "majority view," the rejection of a lease becomes effective upon entry of a court order approving a trustee's or debtor's motion to reject an unexpired nonresidential lease. *See, e.g., Paul Harris Stores, Inc. v. Mabel L. Salter Realty Trust (In re Paul Harris Stores, Inc.)*, 148 B.R. 307, 309 (S.D.Ind. 1992); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 815–16 (S.D.Ohio 1991). This view regards court approval as a "condition precedent" to the rejection of a lease. *Thinking Machines*, 67 F.3d at 1025.[2] Under the "minority view," lease rejection is effective upon filing the motion to reject. Thus, "court approval [is] not ... a condition precedent to an effective assumption or rejection, but rather [is] a safeguard subjecting the decision of the trustee (and its business judgment) to re-

view and possible reversal." *In re Joseph C. Spiess Co.*, 145 B.R. 597, 601 (Bankr. N.D.Ill.1992).

The First Circuit undertook to mend "the seeming rift in the case law" between the majority and minority views. *Thinking Machines*, 67 F.3d at 1028. After thoroughly reviewing the cases on both sides, the court adopted the majority view, concluding that "section 365(a) is most faithfully read as making court approval a condition precedent to the effectiveness of a trustee's rejection of a nonresidential lease." *Id.* at 1025. At the same time, the court emphasized that "nothing in our holding today precludes a bankruptcy court, in an appropriate section 365(a) case, from approving a trustee's rejection of a nonresidential lease retroactive to the motion filing date." *Id.* at 1028. That proviso reconciled the competing approaches and yielded a "single black-letter" rule: "rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively." *Id.* at 1029.

Many bankruptcy courts have since implemented *Thinking Machines'* black-letter rule. *See, e.g., Stonebriar Mall Ltd. P'ship v. CCI Wireless, LLC (In re CCI Wireless, LLC)*, 297 B.R. 133, 138 (D.Colo. 2003); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr.N.D.Tex.1996). Even those courts that deny retroactive relief do so as a matter of discretion, rather than as a matter of law. *See, e.g., In re Chi–Chi's, Inc.*, 305 B.R. 396, 399 (Bankr.D.Del.2004) ("[T]he Court finds that it will not exercise its equitable power to deem the Landlords' leases rejected as of the Petition Date.").

2. Court approval is unnecessary only when a lease is "deemed rejected," pursuant to § 365(d)(4), because of a failure to assume or reject the lease within 60 days of filing for bankruptcy protection. *Ariz. Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Ariz. Appetito's Stores, Inc.)*, 893 F.2d 216, 219 (9th Cir.1990).

Indeed, the equitable authority recognized in *Thinking Machines* has been imported to contexts other than unexpired nonresidential leases. *See, e.g., Malden Mills Indus., Inc. v. Maroun (In re Malden Mills Indus., Inc.),* 303 B.R. 688, 701 (B.A.P. 1st Cir.2004) (applying approach to abandonment of personal property).

Even before *Thinking Machines,* some courts had allowed retroactive rejection of a nonresidential lease, reasoning that nothing in § 365(d) expressly prevents a bankruptcy court from exercising its equitable powers to approve a retroactive rejection. As the Southern District of New York explained in *Constant Ltd. Partnership v. Jamesway Corp. (In re Jamesway Corp.),* 179 B.R. 33, 37 (S.D.N.Y.1995), § 365(d) "does not state that rejection cannot be applied retroactively, or that there are restrictions as to the manner in which the court can approve rejection." The district court below similarly observed that § 365(d) does not specify whether a bankruptcy court may order the rejection of a lease retroactive to the motion filing date. *At Home Corp.,* 292 B.R. at 199.

▮ But statutory silence alone does not invest a bankruptcy court with equitable powers. Those powers are limited and do not amount to a " 'roving commission to do equity.' " *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman),* 325 F.3d 1168, 1175 (9th Cir.2003) (quoting *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)). The Bankruptcy Code limits the equitable powers of bankruptcy courts to the issuance of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Thus, a bankruptcy court must locate its equitable authority in the Bankruptcy Code. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only

be exercised within the confines of the Bankruptcy Code.").

Fortunately, we need look no further than § 365(d) itself to see that, in appropriate cases, retroactive lease rejection may be "necessary or appropriate to carry out" this provision of Title 11. 11 U.S.C. § 105(a). As we have noted, one of the chief purposes of the Shopping Center Amendments was to remedy the "long-term vacancy" of leased premises during protracted bankruptcy proceedings. *See* 1984 U.S.C.C.A.N. at 598–99 (lamenting that under the then-existing version of § 365 "tenant space has been vacated for extended periods of time before the bankruptcy court forced the trustee to decide whether to assume or reject the lease"). Together, §§ 365(d)(3) and (d)(4) operate to force the debtor-tenant to decide quickly whether to assume or reject an unexpired non-residential lease.

▮ Similarly, *Thinking Machines* observed that retroactive lease rejection had the "salutary side effect" of acting "as a stimulus to all parties to cooperate in getting the trustee's motion to reject heard and determined at the earliest practicable date." 67 F.3d at 1028. So courts generally focus on whether the parties have facilitated or hindered the prompt return of the leased premises to the landlord when deciding whether to approve the rejection of a lease retroactive to an earlier date. For example, the court in *In re Amber's Stores* approved the rejection of a lease *nunc pro tunc* to the motion filing date because the debtor "had turned over the keys and vacated the premises prepetition, and served a motion to reject the lease as soon as possible." 193 B.R. at 827. By so doing, the debtor had acted to further the intended purposes of § 365(d): the prompt rejection of the lease and the return of the leased premises to the land-

lord's possession. Thus, equitable relief was appropriate. *Id.*

■ *In re Amber's Stores* is a faithful application of both *Thinking Machines'* black-letter rule and the provisions of § 365(d) themselves. Indeed, neither party argues, nor does any relevant authority suggest, that the exercise of a bankruptcy court's equitable powers in similar circumstances runs counter to § 365(d) or any other provision of the Bankruptcy Code. We therefore hold that a bankruptcy court, in exercising its equitable powers under 11 U.S.C. § 105(a), may approve the retroactive rejection of a nonresidential lease when "necessary or appropriate to carry out the provisions of" § 365(d).

3. *The landlord's possession of the leased premises is not a requirement for retroactive relief.*

Pacific Shores argues that the bankruptcy court exceeded its equitable powers by approving the rejection of the leases retroactive to the motion filing date because Debtor, not Pacific Shores, remained in possession of the leased premises on that date. By permitting a rejection predating the landlord's resumption of possession, Pacific Shores contends, the bankruptcy court thwarted the spirit, if not the letter, of § 365(d). We are not persuaded.

■ The relevant provisions of § 365(d) do not even mention the term "possession," much less elevate it to a condition precedent to a bankruptcy court's exercise of its equitable powers. The legally operative event in § 365(d) is the debtor's or trustee's assumption or rejection of the lease, rather than the landlord's possession of the leased premises.

Congruently, the legislative history refers to a landlord's possession of leased premises only in connection with proceedings by landlords to regain possession of leased premises when the lease has expired by its own terms. 1984 U.S.C.C.A.N. at 600. Like the statute itself, the legislative history focuses on the period of time during which "the debtor has vacated space *but has not yet decided whether to assume or reject the lease.*" *Id.* at 599 (emphasis added). Indeed, the legislative history consistently stresses Congress's intention to hasten the trustee's decision to assume or reject a lease:

[T]enant space has been vacated for extended periods of time *before the bankruptcy court forced the trustee to decide whether to assume or reject the lease.*
. . .
The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by *requiring that the trustee decide whether to assume or reject [a] nonresidential real property lease* within 60 days . . . .

*Id.* (emphasis added).

Our earlier cases similarly emphasize the trustee's decision to reject the lease, rather than the landlord's eventual possession of the leased premises. In *In re Pacific–Atlantic Trading,* we interpreted "section 365(d)(3) [to express] the intent of Congress to secure for lessors the full amount of rent due ... *while the trustee determines to accept or reject the lease.*" 27 F.3d at 405 (emphasis added); *see also Cukierman v. Uecker (In re Cukierman),* 265 F.3d 846, 849 (9th Cir.2001) (noting that § 365(d)(3) requires the trustee to perform all lease obligations "[u]ntil the trustee assumes or rejects an unexpired lease of nonresidential real property").

■ In the normal course, a landlord will regain possession of leased premises shortly after the trustee decides to reject the lease, and the estate must pay administrative rent covering the time between those two acts. *See Federated Dep't Stores,* 131 B.R. at 815 (stating that, "[a]s a general rule, the party seeking relief in any court must bear the risk that the court

may not reach a decision as quickly as the party expected or desired"). But nothing in the text or history of the statute, nor in our case law, suggests that bankruptcy courts are powerless to deviate from the usual rule in appropriate circumstances.

Adopting the interpretation of § 365(d) that Pacific Shores urges would deprive a bankruptcy court of flexibility in molding its orders to reflect the circumstances and the actions of both parties to the lease. In *Jamesway*, for example, the court authorized the rejection of a lease retroactive to the date on which the court would have heard the debtor's motion but for the landlord's frivolous objection and delaying tactics. 179 B.R. at 38. That kind of appropriate relief would be impossible were we to adhere to a strict rule under which the landlord's regaining possession of the leased premises is a precondition to lease rejection.

Pacific Shores attempts to accommodate *Jamesway* by arguing that, although § 365(d)(3) does not preclude retroactive rejection of a lease when, as in *Jamesway*, a landlord is voluntarily deprived of possession by its own malfeasance, it does preclude retroactive rejection when a landlord is *involuntarily* deprived of possession. Other than *Jamesway* itself, Pacific Shores cites no authority that supports that argument. The statute does not support this proposed distinction.

■■■ In the absence of explicit direction from the statute itself, we decline to hamstring bankruptcy courts in this way. We prefer the straightforward approach adopted by the bankruptcy courts in cases such as *Jamesway* and *CCI Wireless*. Af-

ter concluding that nothing in "section 365 prohibits a bankruptcy court from selecting a retroactive date for the rejection of an unexpired nonresidential lease[,] ... the court[s] applied an abuse of discretion standard in considering whether the circumstances of the debtor's case merited retroactive rejection." *CCI Wireless*, 297 B.R. at 138 (explaining and adopting the analysis of *Jamesway*). We expressly adopt that approach here.³

Having held that § 365(d) confers on bankruptcy courts the equitable authority to approve the rejection of a lease retroactive to the motion filing date, we next turn to whether the bankruptcy court properly exercised that authority in this case.

**B. *The bankruptcy court's decision to grant Debtor's motion.***

■■■■ "[I]n most cases a lease will be considered rejected as of the date of entry of the order approving the rejection, and only in exceptional circumstances ... will the court adopt a retroactive date." *In re O'Neil Theatres, Inc.*, 257 B.R. 806, 808 (Bankr.E.D.La.2000). The bankruptcy court below identified four factors supporting its conclusion that "exceptional circumstances" justified retroactive rejection: (1) the immediate filing of Debtor's motion to reject the leases; (2) Debtor's prompt action in setting that motion for hearing; (3) the fact that Debtor never occupied the premises; and (4) Pacific Shores's motivation in opposing rejection of the leases *nunc pro tunc* to the motion filing date. Pacific Shores challenges all but the first of those factors.

---

**3.** In adopting that approach, we necessarily reject Pacific Shores's alternative argument that § 365(d) conditions the retroactive rejection of a lease on the debtor's furnishing its landlord with a formal notice of surrender of the leased premises. As the district court noted, "[t]he cases cited by Pacific Shores discuss surrender as a factor which may weigh in the bankruptcy court's equitable decision to order retroactive relief, but none of them discusses the issue as a distinct legal question or precludes the relief at issue here." *At Home Corp.*, 292 B.R. at 200–01.

### 1. *The absence of delay.*

The bankruptcy court began by commenting that Debtor had moved for rejection of the leases immediately upon filing its bankruptcy petition and had scheduled a hearing "virtually as soon as possible":

> It wasn't perfect. It wasn't done absolutely as soon as possible, but it was done without any delay. There was a holiday in here.... There was neither any deliberate use of a long notice period to keep their options open nor in fact as I can see it any indifference to the timing concerns of the landlord. This is virtually as soon as possible in this particular case.

Pacific Shores takes issue with the bankruptcy court's conclusion that Debtor set its motion for hearing "virtually as soon as possible."

The bankruptcy court itself noted that Debtor should have asked Pacific Shores to stipulate to an immediate rejection of the leases upon filing for bankruptcy. It is, of course, speculative whether Pacific Shores would have agreed, knowing that, by doing so, it would lose $1 million in administrative rent. But even if that option had been available, we cannot say that the bankruptcy court's finding that Debtor moved swiftly to reject the leases is clearly erroneous. The minimal delay in bringing the motion to a hearing was due in part to factors outside Debtor's control, including a court holiday and the fact that a creditors' committee had yet to form by the time of the "first day emergency motions."

Pacific Shores nonetheless argues that, in granting Debtor's motion, the bankruptcy court improperly shifted the burden of justifying delay to the landlord. As we noted in *Pacific–Atlantic Trading,* "[b]y requiring the trustee to timely pay the debtor's rent, Congress clearly placed the burden on the trustee to promptly and properly reject the lease if it has no intention of assuming it." 27 F.3d at 405. Several other courts also have interpreted the amended § 365(d)(3) as a mechanism to shift to the debtor the costs of delay. *See, e.g., Paul Harris Stores,* 148 B.R. at 310; *Federated Dep't Stores,* 131 B.R. at 815.

This argument misunderstands the import of the bankruptcy court's finding. The bankruptcy court did not require Pacific Shores to bear the costs associated with a delay. Rather, the court concluded that there was no appreciable delay in the first place. That conclusion is consistent with the approach taken by other bankruptcy courts in similar situations. In *Paul Harris Stores,* for example, the court held that the effective date of rejection was the date on which the court approved the motion to reject, in part because "[t]he gap i[n] this case—four months, due in part to extensions of time—could hardly be considered small." 148 B.R. at 311.[4] By contrast, the court in *In re Amber's Stores* granted the motion to reject as of the motion filing date, where the debtor "served a motion to reject the lease *as soon as possible.*" 193 B.R. at 827 (emphasis added).

The bankruptcy court found that Debtor brought its motion before the court at the earliest practicable date. *See Thinking Machines,* 67 F.3d at 1028 (explaining that retroactive relief in § 365 cases encourages resolution of a motion to reject "at the earliest practicable date"). That finding is not clearly erroneous, nor was the court's reliance on it an abuse of discretion.

---

**4.** *Paul Harris Stores* addressed the issue of when lease rejection is effective under the statute, rather than the factors to consider in a court's exercise of its equitable powers. Yet the case is instructive insofar as it shows that there is a meaningful distinction between a delay of a few days and a delay of a few months.

2. *The vacancy of the leased premises.*

The bankruptcy court next looked to the fact that Debtor never occupied the leased premises.[5] The circumstances of this case are truly unusual; Debtor paid rent on the two leased buildings for more than a year without ever occupying either one. Although we have found no identical cases, those that discuss a tenant's decision whether to vacate the leased premises provide an instructive parallel. In *In re Chi–Chi's, Inc.*, the court denied retroactive relief in part because the tenants remained on the premises even after the entry of the court's order. 305 B.R. at 399. Similarly, in *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr.N.D.Tex.2003), the court looked to each one of the debtor's subleases individually and found "that the equities of the case allow rejection retroactive to the later of 1) the date Debtors' Motions were filed or 2) the date the leased space was vacated." Indeed, most cases approving the rejection of a lease retroactively to the motion date highlight the fact that the debtor has vacated the premises. *See, e.g., CCI Wireless*, 297 B.R. at 137 (noting that the debtor "vacated the lease premises before or shortly after the date of filing the Chapter 11 case").

Pacific Shores stresses the legal consequence of the automatic stay. Whether or not the bankrupt tenant has vacated the premises, the landlord cannot re-let the premises while the automatic stay is in effect. So, argues Pacific Shores, occupancy is irrelevant.

But the bankruptcy court focused on the practical effect, rather than the legal significance, of the lack of occupancy. By not occupying the premises, Debtor made "it easier for the landlord to re-let [the buildings]." Nothing in the statute, in the precedents, or in logic precludes the bankruptcy court from considering the practical effects of a tenant's lack of occupancy when balancing the equities in the context of § 365(d)(3). Again, we find no abuse of discretion.

3. *The landlord's conduct and motives.*

Finally, the bankruptcy court "note[d] that the landlord's opposition was to any [*nunc pro tunc* ] effect generally without any suggestion here that this process should be speeded up so that ... the landlord could get its indefeasible right to relet the premises more quickly." The court granted the relief requested in part because it was "convinced that the opposition to this relief is motivated by the landlord's interest in running the administrative rent ... [rather than by] a concern to get this indisputable right to start re-letting the premises as quickly as possible."

A landlord's conduct and motives are relevant to a bankruptcy court's equitable deliberations. For instance, *Jamesway* rested its decision to approve the retroactive rejection of a lease exclusively on the landlord's delay of the hearing on the debtor's motion. 179 B.R. at 38. Although Pacific Shores's conduct here is in no way comparable to the landlord's in *Jamesway*, it does not follow that Pacific Shores's conduct, or its motivation, is altogether irrelevant.

**5.** In its order, the bankruptcy court said that "the Debtor is not in *possession* of the premises." (Emphasis added.) As Pacific Shores argued below, and as the district court correctly concluded, the bankruptcy court most likely intended a different meaning: "the bankruptcy court was referring to the fact that At Home did not occupy the premises since construction was still ongoing for the buildings in question." *At Home Corp.*, 292 B.R. at 203. We agree with the district court's interpretation of the bankruptcy court's oral ruling

Neither is the amount of rent necessarily irrelevant. Pacific Shores argues that the bankruptcy court, in stating that Pacific Shores was more concerned with obtaining administrative rent than with re-letting the premises, impermissibly weighed the amount of rent in arriving at its decision. Indeed, the court noted that "[t]his case wouldn't be interesting and wouldn't even be here except for a fairly interesting amount of rent per month."

Relying on *Pacific–Atlantic Trading,* as well as our later decision in *Cukierman,* Pacific Shores contends that we have placed that factor beyond the consideration of the bankruptcy court. *Pacific–Atlantic Trading* held that the contractual rate of rent, rather than the value of the trustee's use of the property, was entitled to administrative priority under § 365(d)(3). 27 F.3d at 405. *Cukierman* extended that holding to the context of a loan disguised as "further rent" under a lease obligation. 265 F.3d at 850. Adhering to the reasoning of *Pacific–Atlantic Trading,* we held that the lessor was entitled to the contractual rate of rent even though the "rent" in question was "arguably completely unrelated to Cukierman's use of the property." *Id.* Taken together, those two cases establish a "bright-line rule" under which the administrative rent owed under § 365(d)(3) "encompass[es] all obligations contained in a bargained-for agreement" regardless of any benefit to the debtor. *Id.* at 851.

That bright-line rule governs the calculation of administrative rent, but it does not render the amount of rent irrelevant to the equitable balancing that a court must perform when deciding whether to approve a motion to reject a lease retroactively. As the district court succinctly explained,

> for purposes of calculating administrative expenses under section 503(b)(1), the fair value of nonresidential leaseholds is irrelevant; in that circumstance,

the contract rate governs. But these provisions do not preclude consideration of the amount of rent that would be due in determining whether the balance of equities weighs in favor of retroactive application of rejection.

*At Home Corp.,* 292 B.R. at 203 (citation omitted). We agree with the district court that the bankruptcy court had the discretion to consider both Pacific Shores's motivation in opposing retroactive lease rejection and the amount of rent owing under the contract.

As did the First Circuit in *Thinking Machines,* "we eschew any attempt to spell out the range of circumstances that might justify the use of a bankruptcy court's equitable powers in this fashion." 67 F.3d at 1029 n. 9. We likewise eschew any attempt to limit the factors a bankruptcy court may consider when balancing the equities in a particular case. We need not and do not decide whether any one of the factors on which the bankruptcy court relied, standing alone, would justify an exercise of discretion. But in combination those factors supported the court's equitable decision.

## CONCLUSION

We agree with the First Circuit's holding in *Thinking Machines* that a bankruptcy court has discretion to grant a motion to reject a nonresidential lease retroactively. The retroactive date of rejection need not be on or after the date on which the landlord regains possession. In view of those holdings, the only remaining question is whether the bankruptcy court abused its discretion in granting Debtor's motion here. We conclude that it did not.

AFFIRMED.